## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOSEPH ENNEKING trustee of the Schmidt )
Builders Supply, Inc. Employee Stock Ownership )
Trust, derivatively on behalf of SCHMIDT )
BUILDERS SUPPLY, INC. )
                                              )
                Plaintiff, )
                                              )
vs. )      Case No. 13-4070-JTM/GLR
                                              )
UNIVERSITY NATIONAL BANK, )
BANKERS' BANK OF KANSAS, TROY )
GREGORY, WALTER CRAIG ELLIS, )
and JOHN W. DUNCAN )
                                              )
                Defendants, )
                                              )
   -and- )
                                              )
SCHMIDT BUILDERS SUPPLY, INC. )
                                              )
                Nominal Defendant. )

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Enneking, trustee of the Schmidt Builders Supply, Inc. Employee Stock

Ownership Plan, on behalf of Schmidt Builders Supply, Inc. for its causes of action against the

Defendants, states and alleges as follows:

1.     This is a corporate derivate action brought by the trustee of an employee pension

benefit plan as that term is defined under Title 1 of the Employee Retirement Income Security

Act of 1974, as amended.  The pension benefit plan is known as the Schmidt Builder's Supply,

Inc. Employee Stock Ownership Trust ("**ESOP**").  The ESOP trustee, as a corporate stockholder,

has stepped into the stead of the corporation in order to advance corporate claims under the

Racketeer Influenced and Corrupt Organizations Act ("**RICO**") 18 U.S.C. § 1961 *et seq.* in order

1

to recover damages for the Defendants' wrongful acts, which ultimately caused the collapse of and worthlessness of equity ownership in Schmidt Builders Supply, Inc. ("**Schmidt Builders**"). This is also a derivative action arising under state law to recover damages for negligent oversight, breaches of corporate fiduciary duty, conspiracy, and aiding and abetting.

2.    The defendants worked together in an enterprise beginning as early as 2006 for the purpose of speculating in a perceived real estate development opportunity and then covering up bad debt arising out of the project's failure. The defendant's debt crisis worsened with each successive cover-up. Instead of simply harming the two defendant banks and speculators, the scheme injured dozens of participating banks, other creditors, and Schmidt Builders.

3.    The bankers used nominee or strawman loans to conceal the actual borrower and new loans with falsified loan documents to bolster and service pre-existing debt, in hopes the next project would pay-off a more immediate default problem. While each member of the enterprise—bankers and speculators alike—had different motives, their essential purpose was to bet on the chance of a big win in Junction City real estate. The gamble, however, demanded scheming to postpone the day of reckoning on loan defaults. Further, with the help of John Duncan, the bankers and other speculators looted Schmidt Builders. Predictably, the cash and building material infusions intended to buy time for the scheme to pay off stopped, causing Schmidt Builders to collapse on July 19, 2011.

### Jurisdiction and Venue

4.    This action is brought pursuant to RICO, 18 U.S.C. § 1961 *et seq*. This court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

5.    This court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 in that those claims are so related to the claims over which this court has original

jurisdiction, they form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is properly in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), in that all defendants reside in this district, and the breaches of duty, fraud, conspiracy, and negligence occurred in this district.

### Parties

7.     Joseph Enneking ("**Enneking**") is a Topeka, Kansas resident and trustee of the ESOP. Schmidt Builders is a Kansas corporation, formerly located in Topeka, Kansas. It was a lumber and building supply store. The ESOP owns 40% of Schmidt Builders' stock. Mary Duncan, John Duncan's wife, owns the remaining 60% of Schmidt Builders' stock. Enneking had no knowledge of the facts asserted herein or that Schmidt Builders was suffering any financial difficulty until Schmidt Builders closed its doors on July 19, 2011.

8.     University National Bank ("**UNB**") is a bank located at 1400 Kasold Drive, Lawrence, KS 66049. UNB may be served by its president, Todd Sutherland, at the same address.

9.     Bankers' Bank of Kansas ("**BBOK**") is a bank located at 555 N. Woodlawn, Building 5, Wichita, KS 67208. BBOK may be served through its resident agent, Bruce Schriefer at the same address.

10.     Troy Gregory was formerly the senior lending officer at UNB and a Senior Vice-President from 2005 to 2009. Gregory may be served at 1221 Vantuyl Dr., Lawrence, Kansas 66049, or wherever he may be personally found. Troy Gregory helped orchestrate the lending scheme described below between the debtors, UNB, and BBOK. He conspired with John Duncan, Craig Ellis at BBOK, and others to loot Schmidt Builders.

3

11.     Walter Craig Ellis ("**Craig Ellis**") is a vice-president of commercial lending at BBOK beginning there in 2002 and continuing to the present. Ellis may be served at 8206 E. Old Mill Street, Wichita, Kansas 67226.  With Troy Gregory, Craig Ellis helped organize and execute the lending scheme described below and promoted the Junction City real estate speculation risk to 24 unknowing participant banks ("**Participants**"). Craig Ellis also conspired with Troy Gregory to loot Schmidt Builders to the detriment of its minority shareholder.

12.     John Duncan was formerly the chief executive officer, chief financial officer, and director of Schmidt Builders. Duncan may be served at 1823 SW MacVicar, Topeka, Kansas 66610. In connection with the lending scheme described herein, John Duncan was indicted on one count each of bank fraud and money laundering on March 6, 2013 in Case No. 13-40013-01-JAR in the United States District Court for the District of Kansas.

### Derivative Action Prerequisites

13.     The ESOP has owned 40% of Schmidt Builders' stock from 2003 to the present. All the causes of actions in this Complaint occurred after 2003. Enneking became co-trustee of the ESOP in 2003 and continues to the present.

14.     Mary Duncan, defendant John Duncan's wife, owned the remaining 60% of Schmidt Builders' stock from 2003 to the present.

15.     This action is not a collusive attempt to confer jurisdiction on this Court.

16.     From 2003 to its collapse in July, 2011, John and Mary Duncan were the sole directors and officers of Schmidt Builders. Any requests to Schmidt Builders' directors to bring this action would have been futile because this action brings multiple claims against a Schmidt Builders' director, John Duncan. It would be futile to demand a director to bring claims involving breach of fiduciary duty, conspiracy, and RICO against himself. Likewise, it would be

futile to demand the other director, Mary Duncan, to bring these claims against her husband. Mary Duncan also had very little involvement in Schmidt Builders leaving all decision-making to John Duncan. Further, plaintiff's counsel wrote a letter dated March 29, 2013 to John and Mary Duncan's lawyer in a case concerning the ESOP (Exhibit 1) regarding the subject matter of this Complaint. Duncans' lawyer never responded to this letter.

### Overview

17. The scheme described in detail below can be summarized as follows:

a. John Duncan and other real estate speculators wanted to place bets on the expected Junction City, Kansas real estate boom in the mid-2000s. Speculative fever was raised by the U.S. Army's announcement that the First Infantry Division (Big Red One), including military personnel and dependents, would permanently relocate to Fort Riley/Junction City.

b. In 2006, David Freeman and others formed Big D Development, LLC ("**Big D**") and Big D Construction. John Duncan was a silent partner in Big D. Big D was the vehicle by which Duncan, Freeman, and other speculators hoped to cash in on the anticipated growth in Junction City. Big D was designed to develop residential lots in Junction City. It spent millions of dollars developing these lots, betting the city of Junction City would reimburse Big D for the costs of development. If the city refused to assist, the development costs would have to be passed along to the lot owners in the form of special assessments and recovered by Big D over an extended time period. That is, without the City's willingness to cash out the Big D speculators from their leveraged risk, development costs would remain with Big D. If the lots did not quickly sell with the added burden of special assessment fees, Big D would be unable to manage its debt. Big D's development lots were part of the Sutter Woods and Sutter Highlands developments in Junction City. Unfortunately, they were designed for single family homes.

        c.       Like certain other banks, UNB wanted in on the Junction City action but did not have the lending ability to make the size of loans needed for the residential gambit Big D envisioned. After the Big D project was underway, UNB's initial participating bank wanted out. UNB was then forced to work with BBOK in order to quickly participate loans out to smaller Kansas banks. BBOK willingly joined the project.

        d.       Big D expended over $20 million developing Sutter Woods and Sutter Highlands and recouped $12 million from Junction City. When Big D sought the remainder of their development costs in late 2007, Junction City and Geary County were unwilling to approve any further costs for development. This denial occurred after Junction City officials learned the soldiers' families were not being relocated to Junction City and the returning soldiers preferred to rent apartment space as opposed to purchasing home lots.

        e.       Due to the speculative nature of the venture, the bad news about the Big Red One and the City's decision meant that in late 2007, Big D, UNB, BBOK, and the guarantors of the Big D and related loans were in trouble. The outstanding Big D debt was approximately $1,880,000, but without military dependents returning to the Junction City area, the Sutter development lots were apparently nearly worthless and could not be sold as anticipated. Further, UNB did not want Big D to fire sale the lots to recoup the loan obligation. UNB's president, Todd Sutherland, was personally speculating on Junction City housing and was heavily invested with a similar project, Olivia Farms, 300 feet from the northern boundary of Sutter Highlands. A fire sale would significantly impair the value of the Olivia Farms' lots and Sutherland's investment. Additionally, UNB had $1,550,000 in other related John Duncan loans with only $680,000 collateral, most of which was in the form of CDs created by the loans and also securing the Big D loans.

f.      Rather than simply taking the losses on a deal gone bad, UNB, BBOK, and the Big D owner/members orchestrated the Bluejay loan scheme. The banks could not have bad loans on the books and banking regulators finding the scheme UNB and BBOK had previously orchestrated to keep Big D afloat with interrelated loans and overlapping collateral. The banks' lending officers also did not want these bad loans reflecting poorly on them as lenders and managers of a regulated entity. Further, Todd Sutherland did not want his Junction City investment soured by Big D's bad fortunes. The bankers, therefore, became desperate.

g.      On its face, the Bluejay loan to construct apartments did not give the obvious appearance of a cover-up. The Bluejay owners, consisting primarily of the Big D owners, were going to build an apartment complex in Junction City. UNB, BBOK, and the 24 Participants would finance the apartment building construction, and the Bluejay owners had a buyer for the completed project. However, the primary purpose of the Bluejay loan scheme was to siphon money from the Bluejay construction to service Big D and other interrelated debt. This would keep the loans from appearing in default on UNB's and BBOK's books and keep Big D afloat in the hope that the sale of the Bluejay apartments would pay off the original building boom bet.

h.      In dealing with the creditor's requirements on remedying the Big D loans, the defendants faced two obstacles. First, the Bluejay borrowers needed over $1.5 million in cash collateral and the Bluejay property lien-free at closing. Second, the banks needed a way to siphon significant money from construction draws to service Big D and other debt that would not raise suspicion. John Duncan, through manipulation of Schmidt Builders, solved both problems. A $15.2 million apartment project needs significant quantities of lumber and material. Schmidt Builders, under the total control of John Duncan, was used to funnel money from Bluejay into

7

the accounts of John Duncan, Big D, and other interrelated entities for seemingly proper purposes.

        i.      UNB and BBOK knew the Bluejay borrowers lacked any creditworthiness or lawful equity in order to secure the Bluejay loan. Also, UNB and BBOK did not have the lending limits (or desire given the facts they actually knew) to loan their own money to liquidate and cease the original Big D bet. Accordingly, they solicited other participating banks with false and misleading information. BBOK reviewed and approved the loan application and proposed participation to member BBOK banks to secure credit for 95% of the $15.2 million Bluejay loan.

        j.      The information BBOK (Craig Ellis) and UNB (Troy Gregory) sent to the participating banks indicated that the borrowers had sufficient cash collateral and the Bluejay property was lien-free. As planned, however, among Troy Gregory at UNB, Craig Ellis at BBOK, and John Duncan, the cash collateral backing the loan was created from the first Bluejay construction draw on April 28, 2008 and placed into "shell" CDs that had been backdated to April 11 to give the appearance of timely, liquid collateral. This first draw was funded partly by the Participating banks. UNB and BBOK knew no collateral existed on April 11, 2008 (except the underlying Junction City property, which was fully encumbered by three mortgages) and that no collateral existed until the first draw on April 28, 2008. Part of the first draw was routed through Schmidt Builders for a fake construction invoice, to John Duncan, and then back to UNB to fund the shell CDs.[1] Without cooperative efforts from each defendant in the enterprise toward purposefully deceiving the Participants and Schmidt Builders, the Bluejay loan could not have been funded.

---

[1] This scheme led to John Duncan's March 6, 2013 indictment for one count each of bank fraud,  18 U.S.C. § 1344, and money laundering, 18 U.S.C. § 1957,  in Case No. 13-40013-01-JAR in Kansas District Court.

k.     Once funded, the Bluejay construction loan was immediately over-budget.

Over $1.5 million from the first construction draw had been used for non-construction related

expenses. This problem required *time* to adjust. In order to buy time, John Duncan caused

Schmidt Builders to send actual building materials to construct the apartments with little or no

hope of receiving prompt payment to Schmidt Builders in return. This generated false equity in

the Bluejay apartments, false accounts receivables on Schmidt Builders' books, and no cash for

Schmidt Builders in return for the lumber. As agreed among Troy Gregory, Craig Ellis, and John

Duncan, John Duncan would send Schmidt Builders' lumber for the apartment construction but

would never demand payment. UNB and BBOK would pay all the other suppliers and

materialmen who would obviously demand payment and place a lien on the property if unpaid,

but they agreed Schmidt Builders would not enforce its claims until the apartments sold.

l.     Like most unlawful schemes, BBOK's and UNB's Bluejay loan scheme

did not payoff. After the housing bubble burst in Junction City, the apartments were appraised

for a lower value than expected. Further, construction loan proceeds had been diverted away

from the Bluejay construction for BBOK's and UNB's benefit on the Big D, John Duncan, and

related loans. Now all the related Big D and Bluejay loans were in default with no possibility of

another roll-away loan scheme. Naturally, UNB and BBOK worked to marshal what few

resources were available for their benefit with no concern regarding the adverse impact on

Schmidt Builders.

m.     UNB and BBOK shored up their failing Big D loans by securing it with a

second mortgage on Bluejay. This added debt to an already underwater asset diluting any

creditors claims, including Schmidt Builders for the lumber it actually shipped. The mortgage

also gave UNB and BBOK direct control over the sale and disposition of the Bluejay property.

9

n.      In late 2009 and early 2010, UNB and BBOK applied all the CDs—including those funded from the first construction draw—to their benefit, including applying the cross-collateralized CDs on the Big D loans. Nothing was done to benefit Bluejay or Bluejay's creditors, including Schmidt Builders.

o.      UNB and BBOK did everything feasible to cure their bad loans no matter the risk or detriment to others. They deceived Participants with misleading information to induce them into taking a piece of the Bluejay loan and risk. The banks and their lending officers continued to deceive Participants with each construction draw because parts of the draws were used to service unrelated debt for the benefit of BBOK and UNB. They used Schmidt Builders as a piggy-bank and funnel of money to prop up the failing loans and to give Bluejay the outward appearance of a successful apartment project. They used strawman loans when they reached banking lending limits. Over a 5-year period, UNB and BBOK worked assiduously to keep the Big D, Bluejay, and related loans current causing millions of dollars of damages to Schmidt Builders, the Participants, and others.

p.      Ultimately, on July 19, 2011, Schmidt Builders, unable to indefinitely carry the weight of bank debt and John Duncan's stealing and deception (in collaboration with the other defendants in the enterprise) collapsed.

### Background – Duncan related entities

18.     On or about June 24, 2005, RAKD, LLC ("**RAKD**") was formed by John Duncan and Andy Richmond, a lumber store manager for Schmidt Builders. Initially, Richmond was named as the sole member and manager of RAKD. Andy Richmond, however, was a strawman for Duncan. Not long after RAKD's creation, Andy Richmond transferred "his" entire interest to John Duncan for no consideration.

19.     On or about May 4, 2006, Big D Development, LLC ("**Big D**") and Big D Construction were formed ("**Big D Construction**"). These entities were owned 50% by David Freeman, 20% by Opportune (an entity owned by Brennan Fagan and William Skepnek), 20% by Larry Sinks, and 10% by Troy Letourneau. John Duncan was a silent partner until 2008 when he replaced Larry Sinks.

20.     On or about May 5, 2006, Opportune, LLC was formed by Brennan Fagan and William Skepnek, each owning one-half of the entity.

21.     At all times relevant to this action, John Duncan was the sole owner and manager of JMD, LLC, a single owner LLC formed prior to 2006.

22.     JMD's only assets in 2006 were six vehicles, five of which were more than ten years old. JMD has since claimed ownership in a door machine, but the door machine was purchased by Schmidt Builders and was at all relevant times located at and used by Schmidt Builders.

23.     On April 3, 2008, Dave Freeman, John Duncan (through JMD), John Larkin, and William Skepnek and Brennan Fagan (through Opportune), formed a limited liability company called Bluejay Properties, LLC.

24.     According to the Operating Agreement signed effective April 28, 2008, Bluejay Properties was 43% owned by David Freeman; 39% owned by JMD; 8% owned by Larkin Excavating (a limited liability company owned by John Larkin) and 10% owned by Opportune.

### The Scheme begins with Big D and a failed Junction City housing project.

25.     On July 21, 2006, although not owners or guarantors of Big D's debts, UNB made JMD and John Duncan a $300,000 loan (loan #5990) secured by all assets of JMD ("**Duncan's $300,000 CD Loan**"). The proceeds of this loan were used to create a CD with UNB

11

immediately used as collateral for UNB to make two loans to the Big D entities ("**Duncan's**

**$300,000 Big D CD**"). This loan was also only created as a sixty (60) day note – yet survived for

four years.

26.     UNB did not perfect, or even attempt to perfect, its security interest in the six

vehicles allegedly owned by JMD which secured Duncan's $300,000 CD Loan.

27.     On or about July 21, 2006, UNB also made a sixty (60) day note to Larry Sinks

for $250,000, the proceeds of which were used by UNB to create another CD that was

immediately used as collateral for the two loans to the Big D entities ("**Sink's $250,000 CD**

**Loan**").

28.     Neither Duncan's $300,000 CD Loan nor Sink's $250,000 CD Loan were taken to

UNB's Loan Committee until two weeks after they were made, at which time both loans were

"ratified" by the UNB Loan Committee.

29.     On or about July 21, 2006, UNB made two loans to Big D: a $1,125,000 loan

(Loan 6212) for a project called "**Sutter Woods**." This Bid D loan is eventually paid off by the

application of CDs in December 2009 and is hereinafter called "**UNB's Big D Loan**"; and a

$2,700,000 loan (Loan 6518) for a project known as "**Sutter Highlands**." The Sutter Highlands

loan was eventually secured by the second mortgage in Bluejay and is hereinafter referred to as

the "**Big D Loan Secured by the Bluejay Second**."

30.     On or about December 26, 2006, UNB loaned Quinton's Properties, LLC

("**Quinton's Properties**"), an entity created and owned by David Freeman, $401,000 to

purchase the real estate on which Bluejay eventually built its apartments ("**Bluejay Real**

**Property**"). UNB took a mortgage on the Bluejay Real Property to secure this loan. This loan

will hereinafter be called the "**Quinton's Properties Loan**."

31.     On or about February 14, 2007, the Big D Loan Secured by the Bluejay Second was renewed into a $5,000,000 line of credit to Big D.

32.     Also on February 14, 2007, BBOK participated all $5,000,000 of the Big D Loan Secured by the Bluejay Second from UNB.

33.     On March 8, 2007, Pat Gideon, president of Silver Lake Bank, sent an email to Todd Sutherland, president of UNB, stating, "I visited with John [Duncan] yesterday and he said he was promised by Troy [Gregory] that the $500,000 loan was approved and would be ready for execution by John on Monday (March 5)…"

34.     On or about March 16, 2007, UNB granted John Duncan a $600,000 (not $500,000) loan (Loan #6587) secured again by all of the assets of JMD, a life insurance policy on the life of John Duncan having negligible cash value, Duncan's $300,000 Big D CD created from the $300,000 CD Loan (which already secured the Big D loans), and a $130,000 CD which was created from the proceeds of this same loan and eventually held at Sunflower Bank.  This loan is hereinafter referred to as "**UNB's RAKD Loan**."

35.     Upon deposit of the loan proceeds of UNB's RAKD Loan, John Duncan by pre-arrangement immediately transferred $500,000 of these funds to Silver Lake Bank as a payment on "RAKD note No. 3567."

36.     The remaining $97,000 was combined with $38,000 diverted from Schmidt Builders and a $127,000 check was written to Sunflower Bank which was used to fund the $130,000 CD/money market that was partial security for the loan itself.

37.     UNB again did not attempt to perfect its security interest in the six JMD vehicles after making UNB's RAKD Loan.

38.     Mary Duncan allegedly guarantees UNB's RAKD Loan, but her signature was

apparently forged.

39.     On or about March 21, 2007, UNB approved a $402,000 loan to JMD and Duncan
for a 14 month note ("**Stonehouse Loan**"), with the stated purpose of assuming an existing loan
with Stonehouse Rentals, Inc. ("**Stonehouse**"). Collateral for the Stonehouse Loan was a first
mortgage on real property in Jefferson County.

40.     At the time the Stonehouse Loan was made, the UNB Loan Committee minutes
reflect that Schmidt Builders was 60% owned by Mary Duncan and 40% owned by an ESOP.
Both John (as manager) and Mary (as President) were employed by Schmidt Builders. John
Duncan's salary in 2007 was $45,455.13 a year.

41.     Three months later, on June 18, 2007, UNB granted John Duncan another loan,
this time for $650,000 (Loan #6812) ("**UNB's Lumber Loan**") secured, once again, by all assets
of JMD, a life insurance policy, the previously pledged CDs, and a previously filed purchase
money mortgage securing the Stonehouse Loan.

42.     The proceeds from UNB's Lumber Loan were deposited into the Schmidt
Builders' bank account. These funds were applied to a receivable John Duncan created at
Schmidt Builders which was titled "Total P Properties re Quinton Heights Project" and stated it
was "to bill for material purchased on futures contracts to protect pricing on project." Upon
information and belief, Total P Properties, another Duncan-related entity, did not authorize the
creation of this receivable and no lumber was purchased from Schmidt Builders.

### Motive – Big D and Related Loans in Trouble

43.     At this point in mid-2007, UNB had provided more than $1,550,000 in three loans
to John Duncan and JMD, two of which have been renewed multiple times with no principal
reduction. This lending was secured only by six vehicles (which UNB did not perfect its security

14

interest as it failed to note its security interest on the face of any of the titles), a door machine (which was purchased and controlled by Schmidt Builders), two life insurance policies with little cash value, and CDs created almost entirely from the proceeds of the same UNB loans they purported to secure (and which were pledged as collateral on several other loans).

44.     In June, 2007, Big D received over $12,000,000 in payments from Junction City, Kansas for infrastructure installation at Sutter Woods and Sutter Highlands. However, even after application of these payments, UNB's Big D Loan retained a $680,000 balance. The Big D Loan, Secured by the Bluejay Second, was paid off but then immediately re-advanced for $2,000,000.

45.     By November 27, 2007, Big D, Big D Construction, and JMD were in default on at least eight loans and over $75,000 in past due payments were due to UNB. In particular, there was $21,436.91 past due on UNB's Big D Loan (6212), $32,202.42 past due on the Big D Loan Secured by the Bluejay Second (6518), and $7,366.25 past due on Duncan's $300,000 CD Loan (5990). In addition, both of the Big D loans had matured by this point in time.

46.     On or about November 27, 2007, UNB learned that the Geary County, Kansas Commission was expressing significant resistance to the funding mechanism that, if passed, would have paid significant monies (approximately $1,700,000) to the Big D entities and allowed the Big D loans to be paid. Although the November rumblings did not represent the Commission's final vote on this issue (that vote would come in the spring of 2008), the November developments did signal the chances of Big D receiving additional payments for infrastructure were unlikely.

47.     Because there was no other source for payment, on or about December 27, 2007, UNB requested that William Skepnek and Brennan Fagan execute a $55,000 strawman loan

("**Skepnek & Fagan Loan**") to pay the past due interest on the matured UNB's Big D Loan and the Big D Loan Secured by the Bluejay Second.

48.     In short, by late 2007, UNB had numerous failing loans that were seriously delinquent, secured with questionable collateral and bore a high likelihood of complete collapse. BBOK had 100% of the Big D Loan Secured by the Bluejay Second which was also in default and had collateral of little value securing it.

**Motive** – How the Bluejay Loan Provided Cash Flow and Collateral for the Failing Loans

49.     Because the Sutter Woods and Sutter Highlands lots had little value and there was scant hope Big D could make any payments on these loans without additional funds from the City of Junction City, Kansas, UNB and BBOK knew they needed the Bluejay Loan (defined below) as a source of funds from which to make the payment on these loans and to create collateral for these existing under-collateralized loans. Furthermore, UNB's president, Todd Sutherland, did not want Big D to sell the lots at a fire sale price because that would potentially harm his investment in Olivia Farms, a similar development 300 feet from Big D's development.

50.     Indeed, after pursuing short periodic extensions of UNB's Big D Loan between late 2007 and the first quarter of 2008, on March 25, 2008, UNB extended the Big D Loan (6212) for a full year because payments and CDs generated from the Bluejay Loan became available to cover Big D's default.

51.     Likewise, after pursuing similar short periodic extensions of the Big D Loan Secured by the Bluejay Second (6518) between late 2007 and 2008, on April 15, 2008, UNB and BBOK (as the 100% participant) extended the Big D Loan Secured by the Bluejay Second for a full year again because the payments and CDs generated from the Bluejay Loan became available.

52.     Additionally, as a part of the UNB and BBOK scheme described below, UNB and BBOK were able to use the Bluejay Loan to orchestrate a related scheme by which UNB exercised use and control over the assets of Schmidt Builders for the benefit of UNB. Specifically, UNB used the assets of Schmidt Builders to pay down an existing loan UNB had extended to Big D, pay down UNB's Lumber Loan (6812), and create equity in the Bluejay Property for UNB and BBOK's own profit and gain.

53.     As part of the scheme, UNB also used the proceeds of the Bluejay Loan to pay past due amounts on over ten unrelated loans to the detriment of Bluejay, its creditors (including Schmidt Builders), and the Participants.

54.     Finally, because of the Bluejay Loan, UNB and BBOK received a payment of $152,000 in loan origination fees and $277,439.41 in prepaid finances charges, and over $600,000 in additional interest over the life of the Bluejay Loan. Plus, UNB and BBOK were able to cause Big D and related Duncan and Freeman loans to appear current and some such loans were even "repaid" with Bluejay Loan proceeds.

**Inception of Bluejay Loan where the harm and fraud impacts innocent third-parties.**

55.     Because the returning soldiers to Junction City, Kansas preferred to rent apartments rather than buy single family homes (which is one reason why the Big D projects were floundering) beginning in mid-2007, David Freeman, John Duncan, William Skepnek, Brennan Fagan (collectively the "**Incorporators**") needed to build an apartment complex in Junction City, Kansas, on property known at the time as "Quinton Pointe."

56.     For some period of time, the Incorporators and their related entities, sought financing to build this apartment complex, but were unsuccessful due to their existing debt

burdens and a lack of capital, monies, or assets necessary to make the loan bankable under generally accepted banking practices and applicable regulations.

57.     Despite the Incorporators' existing debt burden and lack of capital, monies, or assets necessary to obtain a loan to construct the apartments, in March 2008, Troy Gregory and Craig Ellis devised a scheme to conceal the lack of capital and to fund deficiencies in existing loans and create collateral for under-collateralized existing loans using the guise of a "construction loan" for the "Bluejay Apartments" (originally referred to as the Quinton Pointe Apartments).

58.     UNB's scheme required the creation of a new limited liability company, Bluejay Properties, LLC, and the incorporators of Bluejay were directed to transfer the Bluejay Real Property upon which the Bluejay apartments were built, to Bluejay Properties,.

59.     Additionally, UNB needed: (a) several other loans to be brought current, paid off, or participated out so as to avoid legal lending limit violations and adverse regulatory action; (b) to clear the three mortgages and one lien encumbering the Bluejay Real Property; and (c) create cash collateral so that the Bluejay Loan would appear bankable under generally accepted banking practices and regulations.

60.     As a part of the scheme, UNB, with BBOK's cooperation and knowledge: (a) made a strawman loan to John Larkin; (b) made a strawman loan to Luke Oehlert; (c) converted and diverted funds to release two of the three mortgages encumbering the Bluejay Real Property, and (d) orchestrated a series of transfers and fraudulent documents to create the borrower cash (CDs). Each of these components was necessary to make the Bluejay Loan appear to comply with generally accepted banking practices and regulations when reviewed by participants and regulators.

### Components of Bluejay – Strawman Loan to John Larkin

61.     After being assured that the Bluejay Loan would soon be funded by UNB, and at the request of the Big D entities, Larkin Excavating began dirt work on the Bluejay Real Property in anticipation of construction beginning soon. By the end of December 2007, Larkin Excavating had performed $470,613 in work at the Bluejay site.

62.     Larkin continued to work into early 2008, but because he was not being paid for his work, he began to have financial difficulty. Funding for Larkin's invoices was not available because the Bluejay Loan was delayed. It took time for UNB and BBOK to arrange the necessary components so that the loan could be offered for participation since neither UNB nor BBOK could have funded a loan of the size of the $15.2 million Bluejay Loan.

63.     After being told that the loan could not be funded without Larkin's assistance, Larkin agreed to UNB's scheme to make Larkin a $505,000 strawman loan. Although Larkin signed the loan documents, he never received the loan proceeds. The loan was simply a scheme to funnel additional money to John Duncan. John Duncan lacked creditworthiness for the loan, and another UNB loan to Duncan would have exceeded its legal lending limit. The scheme required that $250,000 of the proceeds would be diverted to John Duncan to purchase a CD for use as collateral. Duncan had no other source of money to fund such a CD. The second $250,000 would be used to pay down the Quinton's Properties Loan in order to remove UNB's mortgage. Quinton's Properties, and its members, had no other source of funds to pay off UNB's mortgage and justify freeing the land from the bank lien. This loan is hereinafter referred to as the "**Larkin Strawman Loan.**"

64.     Troy Gregory assured Larkin that the loan would be paid back from the Bluejay Loan and the sale of the Bluejay Apartments, and that the CDs would be released to pay the

Larkin Strawman Loan. Thus, UNB required the loan to be only minimally secured and no borrower cash or down payment was required.

65.     The first $250,000 advanced on the Larkin Strawman Loan was used to fund a CD to indirectly secure the Bluejay Loan as more fully described below (the "**$250,000 Larkin Strawman Loan CD**"). To accomplish this deception, John Duncan wrote a personal check, dated March 24, 2008, to UNB for the creation of a CD. UNB then transferred $250,000 from the Larkin Strawman Loan proceeds to John Duncan on March 25, 2008, so the check would clear John Duncan's bank.

66.     UNB transferred the second $250,000 advanced on the Larkin Strawman Loan to John Duncan on April 29, 2008 (contemporaneously with the $1,225,000 from UNB for the First Draw), to fund the four pre-dated checks totaling $1,369,915, and a $120,000 check to Big D Construction dated May 1, 2008 (UNB's internal documents later state that the $250,000 from Larkin went to fund the $250,000 check payable to UNB to pay down the Quinton's Properties Loan secured by UNB's mortgage on the Bluejay Real Property). This transaction is described more fully below.

### Components of Bluejay - Strawman Loan for Luke Oehlert

67.     The next step in this scheme was to find a new participant (other than Sunflower Bank) or to arrange for someone to assume a UNB note in the amount of approximately $840,000 that was due from Big D (the "**House and 40 Acres Loan**") so that UNB's outstanding indebtedness to the individual members of Big D could decrease below the legal lending limit.

68.     As early as February 7, 2008, UNB began searching for a new participant to take over the House and 40 Acres Loan because Sunflower Bank had refused to renew its participation in the House and 40 Acres Loan.

69.     Finally, after finding no banks willing to participate the loan, UNB and the Incorporators convinced Luke Oehlert, a HVAC contractor who hoped to do work on the Bluejay project, to assume the $840,000 House and 40 Acres Loan from Big D promising Oehlert they would buy it back from him later and that he would have no personal liability.

70.     The assignment and assumption of the House and 40 Acres Loan was finalized on March 21, 2008.

71.     In addition to assuming the House and 40 Acres Loan, UNB arranged for Oehlert to obtain a $400,000 loan from Lawrence Bank, N.A. telling him it was necessary to pay off existing liens on the Bluejay Property so that UNB could make the Bluejay Loan.

72.     Although part of the $400,000 was used to pay an engineering company, approximately $175,000 was used to pay fees to UNB and make past due payments on eight (8) other loans UNB had with Big D and Dave Freeman because there were no other funds available to pay these obligations.

**Components of Plan -** Removing other liens from Bluejay Property

73.     The BBOK Bluejay Loan approval, which BBOK provided to the Participants, required 15% borrower cash/down payment, plus contribution of the Bluejay Real Property free of any liens.

74.     However, on the day the Bluejay Loan documents were signed, April 11, 2008, there were three mortgages on the Bluejay Real Property: the UNB mortgage from Quinton's Properties; a mortgage granted by Quinton's Properties to Stonehouse; and a mortgage granted by Quinton's Properties to AWM Real Estate Fund I, LLC ("**AWM**").

75.     None of these obligations were released and/or satisfied until after the funding of the Bluejay Loan on April 28, 2008.

76.     The lien created by the Quinton's Properties mortgage at UNB was partially paid by the $250,000 pre-dated check from John Duncan that was funded from the First Draw (described and defined below). The UNB mortgage was not released of record until July 21, 2008.

77.     On April 23, 2008, twelve (12) days after the Bluejay Loan documents were dated, Stonehouse released its mortgage on the Bluejay Real Property; however, Stonehouse was not paid until the First Draw funds were used to pay Stonehouse $96,485.90 (more fully described below).

78.     On April 22, 2008, eleven (11) days after the Bluejay Loan documents were dated, UNB and the Incorporators were "anxious" because they had not been able to secure a release from AWM (despite the fact that it had been represented to the Participants the land was free of any liens).

79.     On April 28, 2008, a deal was finally reached with Tavis Holsinger, representing AWM, whereby Holsinger agreed to move AWM's $368,500 mortgage on the Bluejay Real Property to the Sutter Woods and Sutter Highlands property. It was only after this agreement that the Bluejay Loan was funded.

80.     The Bluejay Real Property was not even recorded with the register of deeds until April 29, 2008.

### **Components of Bluejay** - Creation of Borrower Cash/CD

81.     On or about December 5, 2007, UNB's Loan Committee approved a loan to "Quinton Pointe, LLC," an entity to be formed by the Incorporators, to build the apartment complex for $14,400,000 (as described later, UNB/BBOK eventually loans $15,200,000 to build the exact same apartment complex, with the "extra" $800,000 being used by UNB to pay down

other loans and create the CDs that secured it). This loan proposal included no "borrower cash"; it was simply planned to be secured by the mortgage on the property.

82.     A month and a half later, on January 25, 2008, BBOK's Loan Committee approved the Bluejay Loan for $15,200,000 requiring 15% down (equating to $1.8 million dollars in cash or CDs, plus the Bluejay Real Property free and clear of any mortgages or liens).

83.     Because the Incorporators lacked the capital or monies necessary to insert "borrower cash" into the project, prior to BBOK's loan approval, UNB and BBOK discussed using a letter of credit to substitute for $1,000,000 in borrower cash or CDs.

84.     UNB also sought other banks to loan Duncan $1,000,000 so they could create a CD to pledge on the Bluejay project, but were unsuccessful.

85.     Troy Gregory also sought participants other than BBOK who would be willing to participate the loan with only 10% down, including the real property free of liens. But this was also unsuccessful.

86.     UNB recognized that the only possible source for coming up with at least $1,400,000 in borrower cash/CD was John Duncan's diversion of funds and product from Schmidt Builders.

87.     UNB's own Loan Committee even approved making a loan to John Duncan for $1,000,000 to place in a certificate of deposit to collateralize the Bluejay Loan premised on collateral in the form of a letter of credit from another institution. The Committee also required the loan to be participated to keep UNB within its legal lending limit. This loan did not materialize.

88.     Contrary to the February loan committee approval, and with no other way to fund the required borrower cash, UNB and BBOK devised a scheme to use the Bluejay First Draw

23

(defined below) from the Bluejay Loan to convert the assets of Schmidt Builders to create a
$1,500,000 CD to give the appearance of satisfying their collateral requirements and to deceive
the Participants and banking regulators.

89.     UNB and BBOK needed a $1,500,000 loan to Duncan to create $1,500,000 CD so
that the Bluejay Loan would have the necessary collateral. The only source for creating the
necessary collateral (i.e. the CD) was through utilization of the construction loan proceeds.
Presumably, this loan never would have been made if the Participants knew there was no
collateral (i.e. the CD). UNB and BBOK led Participants to believe that the collateral (i.e. CD)
existed by creating a sham CD dated April 11, 2008 in the amount of $1,500,000 ostensibly
owned by John Duncan. Ultimately, on April 28, 2008 (although the loan document was dated
April 11, 2008), UNB made a loan to John Duncan to create a $1,500,000 CD (the Duncan
$1.5mm CD Loan), but only upon receipt of the funds from the Bluejay First Draw, paid as a
disguised lumber payment on that same day.

90.     Because UNB and BBOK used this scheme to obtain the necessary cash to create
the artificial equity (i.e. the CD), it necessitated the conversion of lumber from Schmidt Builders
(discussed below). The construction loan records had to conceal the fact that the Bluejay First
Draw was used to create the collateral necessary to make the loan, and did not in fact buy any
lumber.

### Orchestration - Bluejay Properties Loan

91.     With the Oehlert Strawman Loan, the Larkin Strawman Loan, the scheme to
remove the liens from the Bluejay Real Property, and the scheme to create the borrower cash/CD
in place, UNB and BBOK orchestrated the scheme below to fund the Bluejay Loan.

92.     On April 11, 2008, Bluejay Properties signed a $15,200,000 construction note with UNB which, on its face represented that it was secured by a mortgage in the Bluejay Real Property (free of liens); a $1,500,000 CD pledged by John Duncan (#4778); and a $205,000 CD pledged by Bluejay Properties (#4751) (the "**Bluejay Loan**"). However, neither CD existed on April 11, 2008. Instead, UNB personnel utilized a CD form for the express purpose of concealing the fact that neither CD was funded. (As described in detail below, it should be noted that the original documents referenced a $175,000 CD that Troy Gregory fraudulently altered, or was altered at his direction, to change the amount to a $205,000 CD after April 17, 2008 email from Craig Ellis, although all the documents are dated April 11, 2008.)

93.     On April 11, 2008, at the time the Bluejay Loan documents were signed, none of the purported collateral existed – neither of the CDs existed, nor was the Bluejay Real Property free of liens and indeed had three mortgages with a combined face value of $750,000 encumbering it.

94.     Craig Ellis for BBOK and Troy Gregory for UNB signed the Participation Agreement on April 11, 2008, participating $14,950,000 of the $15,200,000 Bluejay Loan.

95.     BBOK, in turn, participated $14,450,000 to 24 banks (the "**Participants**") leaving BBOK with $500,000 and UNB with $250,000 of the $15,200,000 loan.

96.     In securing their Participants' participations, Craig Ellis at BBOK provided the Participants an Offering on March 21, 2008 via email, (the "**Participant Offering**") which contains false and misleading information regarding how the Bluejay Loan was to be secured and the financial condition of the borrower and its guarantors. Each of these falsities is material to a Participant bank deciding whether or not to participate in the loan. This false and misleading information includes:

a. Only Dave Freeman's Big D debt to BBOK is listed. The other guarantors (Duncan, Skepnek, and Fagan) also had BBOK debt either as guarantors or through the various nominee loans. This conceals that the guarantors were already deeply indebted to BBOK (in addition to UNB).

b. The Participant offering lists a $1.4 million CD at UNB as collateral. Troy Gregory and Craig Ellis knew this was false as no cash collateral existed or could exist until the First Draw. This deception leads a Participant to believe significant collateral exists to support the loan.

c. Regarding Dave Freeman, the Participant Offering states "Bank reports that their experience with him has been very positive and he has shown a trend of successful operations." Craig Ellis and Troy Gregory knew this statement was false as Freeman's loans were in arrears and Big D was failing.

d. Offering states the underlying Bluejay real property is owned "free and clear." Craig Ellis and Troy Gregory knew this statement was false as described above in paragraphs 73-80. Not until after the First Draw were the liens satisfied and released.

e. When describing the guarantors, the Participant Offering states that Dave Freeman will experience a significant increase in liquidity because "He has received word from the City of Junction City that they will be funding, in its entirety, the remainder of Big D's development" of Sutter Woods "in the near future." The defendants all knew this was false as early as November, 2007 when Geary County and Junction City expressed significant resistance to funding further development costs. This was the reason Big D had no liquidity or cash

flow to service its debt and the reason Bluejay was critical to cover the failing Big
D loans.

    f.    Offering states John Duncan owns Schmidt Builders. This statement is false—
Mary Duncan owned 60% and the ESOP owned 40%.

97.    Schmidt Builders was not a guarantor of the Bluejay Loan or otherwise liable to
UNB or BBOK on any debt.

98.    By carefully orchestrating the scheme, UNB, through Troy Gregory, and BBOK,
through Craig Ellis, created the appearance of a legitimate note, mortgage and construction loan.
By using a scheme of loans and transactions (described herein), concealing material information
and falsifying and altering loan documents, UNB and BBOK intended to circumvent generally
accepted banking practices and regulations for the benefit of UNB and BBOK and to the
detriment of Schmidt Builders, its secured lenders, and the Participants.

**Orchestration** - The First Draw from the Bluejay Note

99.    As stated above, the Bluejay Loan was dated April 11, 2008, but it was not funded
on that date.

100.    The first draw (i.e. the first funds disbursed from the loan other than to UNB
itself) did not occur until April 28, 2008 (the "**Bluejay First Draw**").

101.    On April 16, 2008, at Troy Gregory's request and direction, John Duncan, on the
purported behalf of Schmidt Builders, delivered a letter to UNB stating that Schmidt Builders
had purchased the product necessary to construct the Bluejay Apartments and that the product "is
earmarked for this project and can be picked up or identified for delivery to the project site at any
time." (the "**Lumber Letter**").

102.   At the time the Lumber Letter was written and delivered, Troy Gregory and John Duncan knew that the Lumber Letter was false and that no specific lumber or product was identified or segregated for the Bluejay Apartments and was in furtherance of UNB's and BBOK's scheme to conceal the fact that the Incorporators lacked the necessary capital to obtain a construction loan for the Bluejay Apartments.

103.   At the time the Lumber Letter was written and delivered, UNB, BBOK, and John Duncan knew all of the lumber and product at Schmidt Builders was subject to a prior security interest of Sunflower Bank and that no lumber had been pre-purchased or segregated at Schmidt Builders for use in construction of the Bluejay Apartments.

104.   On April 17, 2008, Troy Gregory directed John Duncan to deliver four personal checks made payable to UNB totaling $1,369,915 ("**Four Checks Funded from Bluejay First Draw**"). See Email dated April 17, 2008, incorporated herein as Exhibit 2.

105.   The checks Troy Gregory directed John Duncan to write included: (a) a $350,000 check to pay down UNB's Lumber Loan (6812), (b) a $750,000 check to fund a CD to partially secure a $1,500,000 loan (the Duncan $1.5mm CD Loan, loan # 7646); (c) a $250,000 check to pay down the Quinton's Properties Loan; and, (iv) a $19,975 check to pay down the Stonehouse Loan. The Four Checks Funded from Bluejay First Draw are dated April 18, 2008.

106.   At the time John Duncan wrote and delivered the Four Checks Funded from Bluejay First Draw, Troy Gregory, Craig Ellis, and John Duncan knew that the Duncans did not have the monies to pay these checks.

107.   Indeed, on April 18, 2008, the Duncans had a balance of $19,430.00 in their personal checking account on which the Four Checks Funded from Bluejay First Draw were to be drawn.

108.    The April 17, 2008 email (Exhibit2) also confirmed to John Duncan that "Larkin is ready to send you 250K." As set forth above, this $250,000 was the remaining proceeds from the Larkin Nominee Loan created in March 2008. (See Paragraph 66 above).

109.    At the time the Four Checks Funded from Bluejay First Draw were written, Duncan knew that they were not a payment to Schmidt Builders for lumber, and that the lumber was not yet purchased. Indeed, his exact response to UNB's request for these checks was this April 17, 2008 email sent to "Big D1" and Brennan Fagan:

> Boy I am excited about this, I get 1350000.00 for a lumber draw, and it costs me $1389950.00 in checks. I lose $39950 just to get a lumber draw, wow, what a deal. Then somehow **I have to ship 1350000.00 worth of lumber that I don't have any money to pay for**, I love University national bank. We will make it work this still doesn't pay any money to Pat [Gideon], and I am sure he and Roger [Morningstar] are going to come unglued.

110.    On April 24, 2008, eight (8) days after the Lumber Letter was created and three days after UNB supposedly inspected the lumber, and thirteen (13) days after the loan was made, Duncan instructed a Schmidt Builders employee to create a fake invoice (the "**Photo-shopped Invoice**") showing $1,261,123.61 worth of wood and materials plus sales tax of $95,214.83 for a total of $1,356,338.44. $1,350,000 was the amount referenced in Troy Gregory's April 17, 2008 email (ex. 2), and John Duncan's April 17, 2008 email to Brennan Fagan referenced above in paragraph 109.

111.    The Photo-shopped Invoice was prepared using Schmidt Builders software that was designed to generate a quote for materials which expires thirty days after the quote is generated. The quantity of lumber described in the Photo-shopped Invoice was an amount greater than Schmidt Builders held in its entire, combined inventory at all locations and would have been the equivalent of more than 40 box cars of lumber.

112.    Only after Troy Gregory and UNB had in hand the Four Checks Funded from Bluejay First Draw totaling $1,369,975 was the Bluejay First Draw request approved by UNB and BBOK, which included a designated $1,225,000 disbursement to Schmidt Builders.

113.    On April 29, 2008, UNB/BBOK funded the Bluejay "construction loan" and out of the first draw wired $1,225,000 into the US Bank account[2] of Schmidt Builders.

114.    Although the funds were wired to a Schmidt Builders account, John Duncan, Troy Gregory, and Craig Ellis knew these funds were not to be used to purchase product, but rather were to be transferred to John Duncan's personal account to cover the $1,369,915 in checks that UNB had been holding since April 18, 2008.

115.    Indeed, the next day, April 30, 2008, at the direction of John Duncan and as required by UNB and BBOK, Schmidt Builders wire transferred the $1,225,000 to the account of the Duncans and Four Checks Funded from Bluejay First Draw were deposited by UNB and applied as Troy Gregory had directed in the April 17, 2008 email.

116.    In addition to the $1,225,000 deposit transfer, the $250,000 Troy Gregory promised to John Duncan from the Larkin Nominee Loan also was deposited in the CoreFirst account, and John Duncan drafted a $120,000 check to Big D Construction but gave it to UNB to be deposited and applied to various Big D debts at UNB.

117.    At the time these funds were wired into a Schmidt Builders' account, both John Duncan and Troy Gregory knew these funds were not to be used to purchase product, and indeed there was no such purchase of materials at Schmidt Builders. The Company's Daily Balance

---

[2] At that time, Sunflower Bank was the primary secured lender and Schmidt Builders had its primary checking/operating account at Sunflower Bank. Schmidt Builders also had a secondary account at US Bank. The deposit of these funds into the secondary account at US Banks was an intentional act by both John Duncan and UNB to conceal the transfers from Schmidt Builders' primary secured lender.

Form dated April 29, 2008 and the corresponding US Bank reconciliation does reflect any

money or materials flowing in or out.

118.    Duncan acknowledged the scheme required that Schmidt Builders not get paid for

the lumber in an email to Brennan Fagan dated April 24, 2008, when Duncan said:

> I am then for sure out 1.35 million dollars of capital contribution/loan
> payoffs for dave etc., on a drawdown of amterial (sic) that I certainly have
> little way to pay. Is Larkin going to share any of the draw money that he is
> going to get from this? **I will be brutally honest in that I will be unable
> to perform on 1.35 million dollars of material that I personally or
> Schmidt Builders Supply, Inc. did not get one red cent for.** My lines of
> credit and cash position will not allow the above. There are so many notes
> on this thing that there is no way it is achievable to build. That is why the
> Sunrise/Sunset project is critical to get, but only if it applies cash flow.

See Email dated April 24, 2008, at 11:47 am (emphasis added) attached hereto as Exhibit 3.

("**Not One Red Cent Memos**").

119.    Further confirming that Schmidt Builders would not be paid "one red cent" for the

lumber, a slightly different version of this email is then sent and Troy Gregory at UNB received

a copy of it. In this email, John Duncan states:

> To be brutally honest with you is that it is going to be difficult in these
> difficult times for me to perform on a 1.35 M of material draw that I
> personally or Schmidt Builders Supply, Inc. am paying either into this
> LLC or paying off other notes for people **without getting one red cent of
> money to pay for the material.**

See Email dated April 24, 2008, at 3:04 pm attached hereto as Exhibit 4 (emphasis added).

120.    This $1,225,000 in funds that was passed through Schmidt Builders supposedly

for the purchase of lumber, was instantly diverted from Schmidt Builders' accounts to the

detriment of Schmidt Builders and for the exclusive benefit of UNB, BBOK, Bluejay and its

owners.

## Orchestration - UNB's Creation of Borrower Cash/CD

121.   As set forth above, on its face, the Bluejay Loan was purported to be secured by: (i) a mortgage in the Bluejay Real Property; (ii) a $1,500,000 CD pledged by John Duncan (the "**$1.5mm 'Faked Collateral' CD,"**#4778), and (iii) a $205,000 CD pledged by Bluejay Properties (the "**$205,000 'Faked Collateral' CD**,"#4751).

122.   In addition, as shown above and as set forth in the April 17, 2008 email, the proceeds of the Bluejay First Draw, funneled through Schmidt Builders, created a $750,000 CD (the "**$750,000 CD from Converted Funds**") which was "additional collateral on the $1,500,000 loan."

123.   The $1,500,000 loan made from UNB to John Duncan /JMD (loan #7646) ("**$1.5mm 'Faked Collateral' CD Loan**") was made on the same day as the Bluejay Loan. The proceeds of this loan were used to create the $1.5mm 'Faked Collateral' CD that was pledged as collateral for the Bluejay Loan. Mary Duncan's signature was also forged on these documents.

124.   The $1.5mm 'Faked Collateral' CD Loan was partially secured by the $750,000 CD from Converted Funds, which was created from the Bluejay First Draw (that is, the $1.5mm 'Faked Collateral' CD Loan was funded to create the $1.5mm 'Faked Collateral' CD which was used to secure the Bluejay Loan, the proceeds of which were distributed to fund the $750,000 CD, which in turn secured the $1.5mm 'Faked Collateral' CD Loan).

125.   The remaining collateral for the $1.5mm 'Faked Collateral' CD Loan was Duncan's $300,000 Big D CD created from the Duncan $300,000 CD Loan (and which was cross collateralized on five other notes (see paragraphs 5-42); the $250,000 Larkin Strawman Loan CD (which was cross collateralized on two other notes (see paragraphs 61-66); and a

$130,000 CD owned by David Freeman (which was created out of the Big D loans on July 21, 2006 and collateralized a number of other loans).

126.     Troy Gregory and UNB and Craig Ellis and BBOK created the $1.5mm 'Faked Collateral' CD with the intent to conceal the lack of collateral necessary to have created the Bluejay Loan in contravention of representations to Participants, obligations to examiners, and in violation of a strong public policy that federally insured banks maintain accurate records. Without the $1.5mm 'Faked Collateral' CD, the Bluejay Loan would never have closed or funded.

127.     The second CD to collateralize the Bluejay Loan was a $205,000 CD. Troy Gregory, Craig Ellis, and John Duncan conspired to create the $205,000 'Faked Collateral' CD identified as security for the Bluejay Loan with the same circular scheme with the intent to circumvent customary banking practices and regulations and in violation of a strong public policy that federally insured banks maintain accurate records.

128.     Specifically, the $205,000 'Faked Collateral' CD was funded by: (a) $90,337.79 from the Oehlert Strawman Loan proceeds; (b) $47,674.17 advance on Freeman loan 17661; and (c) $66,988.05 from the monies paid to Big D for the $205,000 'Faked Collateral' CD.

129.     As mentioned above, the original Bluejay Loan documents executed on April 11, 2008, listed a $175,000 CD being created, not a $205,000 CD. The $175,000 CD form did not represent an actual CD because it was not funded.

130.     On April 17, 2008, Craig Ellis informed Troy Gregory that the listed security did not total the 15% borrower cash it had represented to the Participants, thus UNB and BBOK needed to create an additional $30,000 in CDs. See Email dated April 17, 2008, attached hereto as Exhibit 5.

131.    To satisfy the appearance of the 15% borrower cash represented to the Participants, Troy Gregory altered the unfunded $175,000 CD form to make it a $205,000 CD form, which remained unfunded until the Bluejay First Draw. Despite the fact that the $205,000 'Faked Collateral' CD did not exist until April 28, 2008, after the Bluejay First Draw, the CD and the security agreement referencing the $205,000 'Faked Collateral' CD are both dated April 11, 2008.

132.    Although the Bluejay Loan documents and CDs are dated April 11, 2008, Craig Ellis knew the two CDs allegedly securing the Bluejay Loan (and which created the appearance that the borrower had the necessary equity to approve the Bluejay Loan) were not funded as of April 11, 2008, as represented by the documents, but instead that the two "equity" CDs were going to be created from the Bluejay First Draw.

133.    Indeed, at 11:29 a.m. on April 17, 2008, 72 minutes after Craig Ellis's email to Troy Gregory noting the missing $30,000 collateral, BBOK began faxing an Addendum to the Participation Agreement, signed by Craig Ellis, to participant banks noting the CD dated 4/11/2008 was for $205,000. BBOK had previously represented the CD dated 4/11/2008 was only $175,000.

134.    It is clear that BBOK knew that he CDs were to be created from First Draw when, the eleven days after the documents were dated (April 22, 2008), Craig Ellis emailed Rhonda Scott of UNB and stated: "When you book the loan and do your CD assignments and holds, etc. and upload them up, **with the draw request**, we should be good to go." The following day, Gregory informs Ellis that they have "counted the lumber" and Ellis responds "Have Rhonda send up the assignments and holds on the CD's and we'll get the certificate out to you."

135.     Contrary to customary banking practices and regulations, UNB elected to secure

its loans to Bluejay and related entities in manners that did not require the filing of UCC-1s or

other documents with any public entity. These elections were intended to keep the transactions

secret and prevent their borrowers' secured lenders from learning of the loans, thereby allowing

John Duncan to further encumber Schmidt Builders.

136.     The Bluejay First Draw also included a distribution of $243,252.99 to Big D

Construction, ostensibly for "General Conditions."

137.     Despite the fact that the Participant Offering said no money would go to Bluejay

owners, UNB diverted $243,252.99 of the Bluejay First Draw to Big D Construction which was

immediately used to pay: (a) $13,707.91 in Freeman related loan payments; (b) $35,535.69 to

pay off a Freeman Duncan loan (7508); (c) $66,988.05 to partially fund the $205,000 'Faked

Collateral' CD; (d) $96,845.90 to pay off Stonehouse for release of its mortgage on the Bluejay

Real Property; and (e) $30,176.34 was deposited into the Big D Construction account.

138.     Through the use of the Larkin Nominee Loan and conspiring to divert funds from

the Bluejay First Draw, UNB did retain $250,000 of the Bluejay Loan by giving the false

impression that UNB was within legal lending limits (which it was not) and for the purpose of

concealing the lending limit violation which would have prevented the Bluejay Loan from ever

being made by UNB.

### Orchestration –UNB/BBOK's Creation of Equity in Bluejay by Refusing to Pay Schmidt Builders

139.     In addition to the loan scheme, John Duncan, Troy Gregory, and Craig Ellis

further converted the assets of Schmidt Builders to the detriment of Schmidt Builders by failing

to pay Schmidt Builders for all of the product that was actually used to construct the Bluejay

Apartments.

35

140.    Beginning in May 2008 and continuing through the time the Bluejay Apartments were completely constructed, Schmidt Builders delivered over $1,250,000 worth of product to Bluejay that was actually used in the construction of the Bluejay Apartments for which Schmidt Builders was not paid and for which Troy Gregory and Craig Ellis refused to allow construction loan proceeds or the CDs to pay.

141.    By not making all of the payments to Schmidt Builders, UNB was able to reduce the "cost" of constructing the Bluejay Apartments, thus creating equity in the Bluejay Real Property for its own benefit, but to the detriment of Schmidt Builders.

142.    As of July, 2009, the total amount due and owing to Schmidt Builders on the Bluejay Apartments for lumber and product actually used in the Bluejay Apartments was $1,511,478.88.

143.    As of August 25, 2011, the total amount due and owing to Schmidt Builders on the Bluejay Apartments for lumber and product actually used in the project was $1,996,323.29.

144.    Troy Gregory and Craig Ellis also knew that Schmidt Builders purchased 67 washer and dryer units for the Bluejay Apartments and never received payment for the same.

### **Orchestration** - The Second Mortgage on Bluejay

145.    By mid-2009, when it became apparent that the Bluejay Loan would not have enough funds left to complete construction, UNB, BBOK, Bluejay, John Duncan and others began to fight over who would get paid the remaining Bluejay Loan proceeds and what would happen to the multiple CDs.

146.    By late May 2009, there was over $60,000 in past due interest due on UNB's Big D Loan, the Big D Loan Secured by the Bluejay Second, and the Oehlert Strawman Loan for the House and 40 Acres. In addition, the Duncans' $1.5mm CD Loan, UNB's RAKD Loan, UNB's

Lumber Loan, and Duncan's $300,000 CD Loan had over $52,000 in past due interest. The Big D Loan Secured by the Bluejay Second was set to mature at the end of June 2009. It was very important to both UNB and BBOK that the Bluejay Loan not be in default at the end of the quarter.

147.    By mid-2009, UNB's own documents show unequivocally that Troy Gregory and UNB knew the following:

      a.   the Larkin Nominee Loan was acknowledged as a nominee loan made for the benefit of John Duncan;

      b.   the multiple CDs securing the JMD/Duncan loans were created from UNB loan proceeds and collateralized other obligations far in excess of the value of the CDs, therefore leaving the JMD/Duncan loans with no real collateral other than vehicles and equipment of inconsequential value;

      c.   the dates on the Bluejay Loan documents and CDs were intentionally manipulated and falsified;

      d.   the Bluejay First Draw went to fund the $750,000 CD from converted funds and pay UNB on unrelated loans;

      e.   UNB was in violation of their legal lending limits as it related to Duncan;

      f.   there would not be enough funds left in the Bluejay Loan to pay to finish construction of the Bluejay Apartments;

      g.   Schmidt Builders was demanding payment for over $1,500,000 in unpaid materials;

      h.   Kaw Valley was questioning Schmidt Builders' accounts receivable as it related to Bluejay and other Freeman projects;

    i.   Schmidt Builders was in financial trouble and having serious cash flow issues;

    j.   Bluejay, Larkin and Duncan all requested the release of all CDs UNB was holding;

    k.   the six Big D loans and the JMD/Duncan loans had over $110,000 in past due payments due and owing;

    l.   Mary Duncan's signature on more than one UNB loan document was forged; and

    m.  the Sutter Woods and Sutter Highlands lots that secured the UNB Big D Loan and the Big D Loan Secured by the Bluejay Second had no value.

148.    By mid-2009, BBOK's own documents show unequivocally that Craig Ellis and BBOK knew the following:

    a.   The dates on the Bluejay Loan documents and CDs were intentionally manipulated and falsified;

    b.   The Bluejay First Draw went to fund the $750,000 CD from converted funds and pay UNB on unrelated loans;

    c.   UNB was in violation of their legal lending limits as it related to John Duncan;

    d.   There would not be enough funds left in the Bluejay Loan to pay to finish construction of the Bluejay Apartments;

    e.   Schmidt Builders was demanding payment for over $1,500,000 in unpaid materials;

    f.   Schmidt Builders was in financial trouble and having serious cash flow issues;

    g.   Bluejay, Larkin and John Duncan all requested the release of all CDs UNB was holding;

h. the six Big D loans and the JMD/Duncan loans had over $110,000 in past due payments due and owing;

i. Mary Duncan's signature on more than one UNB loan document was forged; and

j. the Sutter Woods and Sutter Highlands lots that secured the UNB Big D Loan and the Big D Loan Secured by the Bluejay Second had no value.

149.    With the knowledge identified in the previous two paragraphs, in mid-2009, UNB and BBOK began devising ways of dealing with the emerging problems with the Bluejay Loan and the Big D Loan Secured by the Bluejay Second. BBOK demanded that "all common members of Bluejay and Big D MUST pledge their ownership equity in Bluejay to Big D."

150.    In mid-2009, BBOK had 100% of the Big D Loan Secured by the Bluejay Second. As of June 5, 2009, according to the loan documents, the only collateral the Big D Loan Secured by the Bluejay Second were the Sutter Woods and Sutter Highlands valueless lots. UNB had 100% of UNB's Big D Loan and $250,000 of the Bluejay Loan.

151.    The idea of securing the Big D loan with the "equity" in Bluejay evolved over the month of June, at which point, on June 29, 2009, Troy Gregory informed Bluejay, John Duncan, Fagan, and Skepnek that UNB and BBOK demanded, not just the equity, but a $1,200,000 second mortgage on the Bluejay Apartments. Troy Gregory acknowledged that John and Deanna Larkin would have to agree to the second mortgage, even though the Larkins had no obligation on the Big D loans.

152.    The next day, June 30, 2009, UNB and BBOK, by Craig Ellis, signed an amended participation agreement (the "**Amended Participation Agreement**") to the Big D Loan secured by the Bluejay Second, which stated that the loan was secured by a real estate mortgage dated June 30, 2009, for $1,200,000 from Bluejay Properties, even though no such mortgage existed.

153.    UNB, by Troy Gregory, also extended and amended the Big D Loan Secured by the Bluejay Second on June 30, 2009, again, referring to $1,200,000 mortgage that did not exist.

154.    The Amended Participation Agreement, the June 30, 2009 extension and amendment to the Big D Loan Secured by the Bluejay Second, and the June 30, 2009 second mortgage on the Bluejay Apartments were all dated June 30, 2009, to conceal the fact that the Big D Loan Secured by the Bluejay Second was actually in default at the end of the second quarter.

155.    After vigorously resisting signing the second mortgage to burden Bluejay with the debt of Big D, John Larkin finally signed the mortgage on July 7, 2009, under the threat of foreclosure on the Bluejay Loan and an immediate demand on his and his wife's personal guaranties.

### Damages - Diversion of Bluejay Assets to UNB

156.    With BBOK's knowledge and consent, UNB used the loan proceeds from Bluejay to make payments on many unrelated loans to the detriment of Bluejay and its creditors, including Schmidt Builders.

157.    In the construction budget, Troy Gregory and UNB authorized David Freeman to receive a $25,000 monthly salary ($300,000 a year) to "oversee" the Bluejay Apartment construction, even though Craig Linn was the construction supervisor. The compensation was a scam used to disguise that UNB was diverting approximately $17,000 of the $25,000 every month to pay unrelated loans at UNB. UNB's January 12, 2009 Loan Review of Freeman Loans states "Bank indicated borrower drawing $25M per month fee from Blue Jay Properties to repay debt.

158.   Besides the Freeman "salary," UNB also diverted proceeds from individual Bluejay Draws to keep various Big D loans from becoming more than thirty days past due.

159.   On May 14, 2008, when UNB's Lumber Loan (6812) was extended, the loan report stated "the primary source of repayment of this loan will be from lumber draws on construction line of credits being funded by UNB."

160.   Troy Gregory, Craig Ellis, and John Duncan conspired to use the Bluejay "construction" loan to pay down UNB's Lumber Loan (6812) and to allow John Duncan to make a $300,0000 payment on the RAKD loan at Silver Lake Bank. This scheme worked as follows:

   a.   On October 31, 2008, John Duncan created two fake invoices claiming money due to RAKD – one for $80,096.04 and one for $39,496.00 – which were submitted as part of Draw 8 on the Bluejay Loan. This is hereinafter referred to as the "**October Faked RAKD Invoices**."

   b.   Troy Gregory and Craig Ellis knew that RAKD was a shell real estate company owned by Duncan and was not a contractor or supplier, yet Troy Gregory and Craig Ellis approved the payment to RAKD from the Bluejay "construction" loan based on the October Faked RAKD Invoices. In addition, Troy Gregory and Craig Ellis did not question why RAKD's request for payment was simply two Schmidt Builders invoices (with no mark-up or other work done).

   c.   On November 13, 2008, Troy Gregory and Craig Ellis approved, and UNB paid, RAKD $119,592.52 from the Bluejay Loan proceeds on the October Faked RAKD Invoices.

   d.   As a *quid pro quo*, on the day after UNB issued the RAKD payment, Duncan diverted Schmidt Builder's funds to pay $75,000 on UNB's Lumber Loan (6812).

e. On December 2, 2008, Duncan changed the date on the October Faked RAKD Invoices and resubmitted them with a date of December 2, 2008. Duncan also created a third faked RAKD invoice in the amount of $33,394.48, collectively hereinafter referred to as the "**December Faked RAKD Invoices**."

f. Again, Troy Gregory and Craig Ellis did not question the draw to RAKD or the fact that the invoices were identical to the month before. Troy Gregory and Craig Ellis approved the draw request, and UNB paid $152,987.00 to RAKD from the Bluejay Loan "construction" loan proceeds on the December Faked RAKD Invoices.

g. On the same date that the December Faked RAKD Invoices was created, a $75,000 "charge back" was created on Consolidated Construction Services ("CCS") invoice (a company owned by Duncan), and its Bluejay disbursement was reduced accordingly. This is the only significant charge back that ever occurred during the Bluejay project.

h. Schmidt Builder's records show that no materials listed in either the October Faked RAKD Invoices or the December Faked RAKD Invoices were ever actually shipped (or even ordered) for the Bluejay Apartments.

i. UNB and BBOK records show these were the only two draw requests ever made by RAKD for this project.

j. In total, UNB/BBOK allowed $272,579.52 to paid to RAKD on the October and December Faked Invoices for which Bluejay received nothing in return (less a $75,000 credit against CCS's bill), and for which UNB received a $75,000 payment on UNB's Lumber Loan.

**Damages -** UNB's Creation of Equity in Bluejay from the Certificates of Deposit

161.    From March 2008 until the CDs were applied by UNB to the Bluejay Loan, UNB received and took the interest earned on the $1.5 mm 'Faked Collateral' CD and the $205,000 'Faked Collateral' CD that, as described above, were created from converted Schmidt Builders funds and/or inventory.

162.    In total, $79,754.73, in interest was diverted from the $1.5 mm 'Faked Collateral' CD and the $205,000 'Faked Collateral' CD to make payments to non-Bluejay loans at UNB.

**Damages -** Direct Payments to UNB from Schmidt Builders

163.    From July 31, 2008 through July, 2011, John Duncan diverted $264,663 of Schmidt Builders funds to make payments on the multiple UNB loans discussed above for which Schmidt Builders had no obligation. These checks were all written on Schmidt Builders' account at US Bank to hide the payments from Schmidt Builders' secured lender, Kaw Valley.

**Damages -** Additional Damage to Schmidt Builders

164.    The actions of John Duncan and UNB described above caused additional harm and damage to Schmidt Builders by diverting Schmidt Builders' cash flow during a time in which the economic downturn was also causing significant hardship to the company.

165.    As described by John Duncan on September 23, 2008 in an email to Brennan Fagan, not only had Schmidt Builders delivered $1,439,306.56 in materials (as of September 23, 2008) to construct the Bluejay Apartments for which Schmidt Builders had not been paid, Duncan had also been diverting Schmidt Builder cash flow to make payments to UNB on Duncan's personal obligations to UNB, including Duncan's $1.5mm CD Loan, Duncan's $300,000 CD Loan, UNB's RAKD Loan, UNB's Lumber Loan, and several other notes. He states:

I do not want a penny more than the above out of the projects that are coming due, however, **I cannot continue to fund these operations. I am cash broke completely. I have put every dime I have of cash into these projects to get them off the ground** . . . **I am tired, I am tired of not sleeping, I am tired of wondering if and when paybacks may happen** . . . I will admit this is not the only drain on my cash flow, regretfully builders are NOT paying me left and right, similar to the first cash flow issues, both are putting undue pressure on this partnership to perform, which it seemingly does not have the ability to do.

See Email dated September 23, 2008 (emphasis added), attached hereto as Exhibit 6.

166.    The actions of John Duncan and UNB described above caused additional harm and damage to Schmidt Builders because Schmidt Builders' operating line of credit allowed Schmidt Builders to borrow against its outstanding accounts receivable and current inventory. By creating false and misleading receivables and inventory, Schmidt Builders was able to borrow monies from Kaw Valley that it would not otherwise have been able to borrow and did not need to pay Schmidt Builders' operating expenses.

167.    The actions of John Duncan and UNB described above caused additional harm and damage to Schmidt Builders because the transactions were orchestrated so as to maximize secrecy and non-transparency allowing Kaw Valley to make further extensions of credit and loans to Schmidt Builders and further encumbering and damaging the Company.

**Damages -**Application of $1.5mm 'Faked Collateral' CD and $205,000 'Faked Collateral' CD

168.    From July, 2009 until late December, 2009, Bluejay and its members and UNB and BBOK engaged lawyers who sparred over the application of the $1.5mm 'Faked Collateral' CD and the $205,000 'Faked Collateral' CD, as well as other CDs held by Bluejay members. During this time, the "issues" related to the loans (outlined above) were discussed between the parties on numerous occasions.

169.    With full knowledge of the improper nature of the multiple loans and their "security", and with full knowledge of Schmidt Builders' claims for payment, rights in the CDs,

and the financial difficulty Schmidt Builders was experiencing, UNB and BBOK applied the CDs for UNB and BBOK's own benefit and to the detriment of Schmidt Builders.

170.    The $1.5mm 'Faked Collateral' CD and the $205,000 'Faked Collateral' CD created from the scheme outlined above were applied to the Bluejay Loan. Specifically, the $205,000 'Faked Collateral' CD was applied in September, 2009 to make partial Bluejay payments; with the remaining applied to the Bluejay Loan on November 27, 2009. The $1.5mm 'Faked Collateral' CD was applied to the Bluejay Loan on November 25, 2009.

### **Damages** - Application of CDs to UNB's Big D Loan

171.    In November 2009, UNB's Big D Loan had an outstanding balance of approximately $680,000 and was 100% owned by UNB. The Big D Loan Secured by the Bluejay Second had an outstanding balance of approximately $1,185,000 and was owned 100% by BBOK.

172.    In November 2009, the $250,000 Larkin Nominee Loan CD, Duncan's $300,000 Big D CD, and the $130,000 Freeman Nominee CD secured both UNB's Big D Loan and the Big D Loan Secured by the Bluejay Second.

173.    Beginning in November 2009, UNB and BBOK began plotting how to apply the three CDs which secured both UNB's Big D Loan and the Big D Loan Secured by the Bluejay Second.

174.    BBOK could have demanded that UNB apply the $680,000 in CDs to the Big D Loan Secured by the Bluejay Second, which would have reduced the outstanding amount due on the Big D Loan Secured by the Bluejay Second from $1,185,000 to $505,000.

175.    But instead, by December 2009, UNB and BBOK had conspired to form a plan that would benefit both UNB and BBOK such that UNB would "buy back" part of the Big D

45

Loan Secured by the Bluejay Second (i.e. reduce BBOK's liability) and in exchange BBOK would let the three CDs, totaling $680,000, be cashed in and applied to UNB's Big D Loan and to take UNB's remaining $250,000 in the Bluejay Loan.

176.    This scenario allowed UNB to pay off UNB's Big D loan and replace that liability with a similar amount of the Big D Loan Secured by the Bluejay Second (which, of course, was secured by the Bluejay Second).

177.    This "swap" as described in the previous three paragraphs was partially accomplished by BBOK and UNB on December 31, 2009, and completed on January 13, 2010.

178.    This swap harmed Bluejay, the Participants of the Bluejay Loan, and Schmidt Builders. A reduction in the Loan Secured by the Bluejay Second would have allowed the other Bluejay creditors, including Schmidt Builders, to recoup more or all of the amounts owed.

179.    This swap was described in the UNB Loan Committee minutes as follows: UNB had a potential legal lending limit violation as $680,000 in CDs that were first pledged to a $680,000 UNB loan[s] were subordinated to BBOK per a participation agreement on a $1,185,000 loan. BBOK bought 100% of this loan. Borrower's CDs were cashed in and applied to interest and paid down loans [UNB's Big D Loan]. UNB bought back BBOK's portion of the $1.2 million loan on the Big D lots and now has $467,894 of that loan….. [Duncan's] individual debt at UNB is $1.755 million with collateral of 2 pickup trucks, 4 other trucks, life insurance, and a door machine….BBOK bought UNB's $250,000 portion of [the Bluejay Loan].

180.    The application of the $680,000 in these three CDs to UNB's Big D Loan with the full knowledge outlined in paragraphs 147 and 148, was a diversion of those CDs to UNB and BBOK's benefit and to the detriment of Schmidt Builders.

### Causes of Action

### Count 1 – RICO

*Racketeering Activity under 18 U.S.C. § 1961(b)*

181.    As set forth in John Duncan's indictment (Exhibit 7) and described in this

Complaint, Duncan committed bank fraud under 18 U.S.C. § 1344 and money laundering under

18 U.S.C. § 1957 in connection with the April 16, 2008 fake "Lumber Letter" and April 24,

2008 "Photo-shopped Invoice". As described in paragraphs 99-120 of this Complaint, these false

statements were used to obtain a distribution on the first lumber draw to fund the initial collateral

for the Bluejay Loan. In addition to the indictment charges, John Duncan committed additional

acts of wire fraud under 18 U.S.C. § 1341, mail fraud under 18 U.S.C. § 1342, and bank fraud

under 18 U.S.C. § 1344 as described herein.

182.    Troy Gregory and Craig Ellis committed multiple acts of wire fraud under 18

U.S.C. § 1341, mail fraud under 18 U.S.C. § 1342, bank fraud under 18 U.S.C. § 1344, and

money laundering under 18 U.S.C. § 1957 for the following acts, which is not intended to be

exclusive:

        a.  Participation Offering sent to participant banks on March 21, 2008 as described in
paragraph 96. The falsities contained in the statements were made to deceive
Participant banks to lend money for the Bluejay Loan, which constitutes bank
fraud.

        b.  Addendum to Participation Agreement and Certificate transmitted to participant
banks on 4/17/08, which states a $205,000 CD (#4751) secured the collateral,
which Troy Gregory and Craig Ellis knew to be false as the CD would be funded
with the first loan draw, as described in paragraphs 127-134.

        c.  Approving and using backdated CDs (April 11, 2008) to give the appearance of
collateral when Troy Gregory and Craig Ellis knew the CDs were not funded until
the first draw on April 28, 2008.

        d.  Approving the first construction loan draw, funded in part by Participant banks.
Troy Gregory and Craig Ellis knew the proceeds were not be used to build the
Bluejay apartments but to generate collateral to secure the loan from which it was
derived, pay off Big D and other debt unrelated to the Bluejay construction, and

       clear title to the underlying real property, which had previously been represented to be clear.

e.  Every construction draw requesting management fees for David Freeman was false as described in paragraph 157. Troy Gregory and Craig Ellis knew the fee was to repay Big D and other debt owed to UNB and not for constructing the Bluejay apartments. Craig Linn was the construction manager.

f.  The June 30, 2009 Big D loan Secured by the Bluejay Second, Amended Participation Agreement, and related documents state they are secured by a mortgage dated June 30, 2009. This was false as the mortgage did not become effective until July 7, 2009, the date the Larkins signed.

183.    Dave Freeman committed bank fraud under 18 U.S.C. § 1344 and violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5324 as set forth in his indictment in Case No. 5:09-cr-40045-RDR. Sutter Woods and Sutter Highlands could only be profitable for Big D, Big D's owners, and Big D's lenders with the city development contracts. In furtherance of the scheme, Freeman helped obtain these city contracts by bribing Junction City commissioner, Michael Wunder, in 2006-2007 in return for the Sutter Woods development contracts and then trying to cover-up the payments. These acts benefited the other Big D owners (John Duncan, William Skepnek, and Brennan Fagan) and Big D lenders, UNB and BBOK.

*Enterprise*

184.    John Duncan, Troy Gregory, Craig Ellis, Dave Freeman, William Skepnek, Brennan Fagan, and others were associated in fact through their development operations in Junction City beginning as early as 2006 and continuing through the present, which association in fact constituted an enterprise as defined in 18 U.S.C. § 1961(4).

185.    John Duncan, Troy Gregory, Craig Ellis and others materially participated in the RICO enterprise. The ownership group, including John Duncan, needed lenders willing to float the loans and provide additional operating capital for the various entities. Troy Gregory and UNB did not have the lending limits necessary to fund Big D, Bluejay, nor any of the related loans and, therefore, relied on BBOK to participate out the loans. BBOK, through Craig Ellis,

actively inserted itself by joining in on the Junction City speculation. Instead of simply cutting its losses, Craig Ellis and BBOK continued to work with Troy Gregory and UNB in order to keep all the loans current. These actions by Craig Ellis and BBOK caused them to become a component part of the RICO enterprise.

186.    Troy Gregory designed and implemented the scheme involving the strawman loans and back-dated CDs funded from the first construction loan draw. Craig Ellis carried out his role by creating and transmitting the misleading information to the participant banks in order to fund the scheme. Further, John Duncan willingly falsified Schmidt Builders' invoices, shipped over one million dollars' worth of Schmidt Builders' lumber—lumber for which Schmidt Builders did not receive payment—and otherwise held up his end of the bargain to ensure the scheme continued.

*Pattern*

187.    The wire frauds, mail frauds, bank frauds, and violations of banking secrecy laws described herein and in paragraphs 181-183, committed upon the participant banks, Schmidt Builders, and Schmidt Builders' creditors constituted a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The attempts by the lenders to continue to cover up the bad loans demonstrates the threat of continuing activity to the same types of entities harmed by these defendants: unsuspecting participating banks and shareholders of corporations controlled by dishonest co-conspirators in the scheme.

188.    The predicate acts committed by bankers, Troy Gregory and Craig Ellis, may easily be repeated in the future. The very nature of their acts, including falsifying loan documents and using nominee or strawman loans to avoid lender liability limits or embarrassing

loan defaults, are self-concealing and could embroil banks and businesses in similar loan default or Ponzi-like schemes in the future.

189.    The above-described acts of John Duncan, Troy Gregory, and Craig Ellis affected interstate commerce and constitute violations of 18 U.S.C. § 1962(a), (b), and (c).

190.    John Duncan, Troy Gregory, and Craig Ellis conspired to violate 18 U.S.C. § 1962(a), (b), and (c) in violation of 18 U.S.C. § 1962(d).

191.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962, Schmidt Builders has sustained injury to its business and property in an undetermined amount believed to be in excess of $10,000,000. In addition to these damages, plaintiff is entitled to treble damages and attorney's fees under 18 U.S.C. 1964(c).

### Count 2 – Negligent hiring, training, supervising, and retention by UNB and BBOK

192.    UNB employed Troy Gregory from 1992 to July, 2009.

193.    BBOK employed Craig Ellis from June, 2002 to the present.

194.    UNB and BBOK owed a duty to not hire or retain employees unfit and incompetent to perform the required duties.

195.    As previously described, Troy Gregory and Craig Ellis committed multiple acts of fraud and other banking violations (e.g. backdating documents, utilizing strawman or nominee loans, subverting lender liability limits and hiding the truth about high-risk borrowers and loan defaults) over more than a 4-year period.

196.    Most of the loan requests, including the supporting documentation, required UNB's and BBOK's respective loan committees' approval and some required full board approval. As such, UNB and BBOK knew or should have known that Troy Gregory and Craig Ellis were violating banking laws and were otherwise unfit and incompetent to perform their

duties. Additionally, UNB and BBOK failed to properly supervise and/or train Troy Gregory and Craig Ellis in their job functions.

197.    UNB and BBOK's failure in hiring, training, supervising, and retaining Troy Gregory and Craig Ellis caused the dishonest lending scheme outlined above to continue and grow. The ongoing failure to supervise and/or timely dismiss Gregory and Ellis caused further harm to Schmidt Builders as described above. A simple review of the documents, specifically the backdated Bluejay documents, would have brought an immediate halt to the ongoing loan scheme and would have stopped further loss to Schmidt Builders.

198.    As a direct and proximate cause of UNB's and BBOK's negligent acts, Schmidt Builders sustained injury to its business and property in an undetermined amount believed to be in excess of $10,000,000.

### Count 3 – Breach of corporate fiduciary duty by John Duncan

199.    From 2003 through July, 2011, John Duncan was a director and officer of Schmidt Builders. As such, he owed the highest measure of duty, and the most scrupulous good faith to Schmidt Builders.

200.    John Duncan's acts of shipping free lumber, falsifying inventory records, misleading Schmidt Builders' creditors, and use of Schmidt Builders' assets to pay for personal and business debts with no benefit to Schmidt Builders directly violated his corporate fiduciary duties owed to Schmidt Builders.

201.    As a direct and proximate cause of John Duncan's acts, Schmidt Builders sustained injury to its business and property in an undetermined amount believed to be in excess of $10,000,000.

### Count 4 – State law conspiracy

202.    The defendants knowingly joined together to loot Schmidt Builders with the expectation to earn a return for the efforts. Specifically, all defendants conspired with John Duncan in breaching his corporate fiduciary duties to Schmidt Builders.

203.    The banks and their officers knew John Duncan did not have the collateral for the Bluejay loans but would use Schmidt Builders and the "Faked Invoice" to funnel money out of Schmidt Builders for the back-dated CDs. With this knowledge, they actively assisted John Duncan in obtaining funds from the first draw on the construction loan, routing it through various bank accounts, and into the back-dated CDs.

204.    The banks and their officers helped John Duncan loot Schmidt Builders inventory to build false equity in the Bluejay apartments. They knew over a million dollars of Schmidt lumber had been used for Bluejay construction, and as part of their agreement with John Duncan, they never approved payment for the lumber.

205.    Acts in furtherance of their state law conspiracy are further described above in paragraphs 181-191, relating to the RICO cause of action and paragraphs 199-201, relating to John Duncan's breach of corporate fiduciary duty.

206.    The intentional acts by all defendants furthered the same purposes and objectives—concealing all the failing loans from banking regulators and management, propping up failing business enterprises, and providing cash flow to John Duncan and the other owners. Their acts concealed the looting and fraud from Schmidt Builders' auditors and creditors, concealed the bad loans from banking regulators, and caused further damage with each successive act. Each defendant knowingly and willfully furthered the success of the wrongful looting scheme.

207.    As a direct and proximate cause of the defendants' acts, Schmidt Builders sustained injury to its business and property in an undetermined amount believed to be in excess of $10,000,000 for which they are jointly and severally liable.

### Count 5 – Vicarious liability against BBOK and UNB

208.    Craig Ellis was a BBOK employee, a Vice-President, during the relevant time, and his employment has continued to the present.

209.    Craig Ellis's acts were taken on behalf of BBOK and benefited BBOK. BBOK received significant loan origination fees, prepaid interest, and additional interest on the multitude of loans referenced herein. BBOK also reduced principal and concealed bad debt by and through Ellis's actions.

210.    BBOK's loan committee and board of directors knew or acquiesced in the activity committed by Craig Ellis. Without the ongoing approval and ratification of Craig Ellis's acts beginning as early as 2007 and continuing into 2010 and perhaps beyond, the wrongful acts committed against Schmidt Builders and others would have never happened or might have been halted before Schmidt Builders was destroyed as an ongoing business. Accordingly, BBOK is vicariously liable for all acts and resulting liability of Craig Ellis cited herein.

211.    Troy Gregory was an employee, a senior lending officer and, in fact, the only commercial lending officer for UNB, during the relevant time until he was forced to resign in July, 2009.

212.    Even after Troy Gregory resigned, UNB employees, at the direction of senior UNB officers and its president, Todd Sutherland, perpetuated and covered-up Troy Gregory's acts to avoid the loss and embarrassment of defaulted loans Gregory had originated.

213.    Troy Gregory's acts were undertaken on behalf of UNB and such acts benefited UNB. UNB received significant loan origination fees, prepaid interest, and additional interest on the loans referenced herein. UNB also reduced principal and concealed bad debt by and through Gregory's actions.

214.    UNB's loan committee, board of directors, and president, Todd Sutherland, knew or acquiesced in the activity committed by Troy Gregory and the other employees working on these relevant loans. Troy Gregory received substantial bonuses in 2005, 2006, and 2007 and received an "excellent" evaluation by Todd Sutherland in October, 2008.

215.    Without the ongoing approval and ratification of Troy Gregory's and his successor's acts beginning as early as 2007 and continuing into 2010 and perhaps beyond, the wrongful acts committed against Schmidt Builders and others would have never happened or might have been halted before Schmidt Builders was destroyed as an ongoing business. Accordingly, UNB is vicariously liable for all acts and resulting liability of Troy Gregory.

### Count 6 – Aiding and abetting

216.    Troy Gregory, Craig Ellis, BBOK, and UNB directly participated in and allowed John Duncan to convert assets from Schmidt Builders and are complicit in such unlawful, wrongful, and tortious conduct.

217.    The defendants directly aided and abetted John Duncan in Duncan's breach of his obligations to Schmidt Builders, by (a) directing John Duncan to use Schmidt Builders' lumber for the Bluejay apartments, but not permitting payment for such lumber assets, (b) preventing payment of Schmidt Builders' invoices for lumber for the Bluejay apartments, (c) creating false receivables and inventory, and (d) causing Schmidt Builders to make loan payments to UNB that Schmidt Builders had no obligation to pay.

218.    These intentional acts of aiding and abetting John Duncan's conversion and breach of fiduciary duty caused direct harm to Schmidt Builders in excess of $10,000,000.

## Count 7 – Punitive Damages

219.    As described above, UNB and BBOK, through Troy Gregory and Craig Ellis, intentionally conspired with and aided and abetted John Duncan to loot Schmidt Builders.

220.    Troy Gregory and Craig Ellis were senior lending officers (Gregory a senior vice-president from 2005-2009, and Ellis a vice-president at all relevant times through the present) and committed these acts within the scope of their authority with UNB and BBOK.

221.    Additionally, these acts were authorized and ratified by UNB's and BBOK's upper management.

222.    For these intentional acts, punitive damages should be imposed against all defendants in an amount to be determined at trial.

WHEREFORE, plaintiff seeks judgment against the defendants as follows:

a)    On Count 1 against Troy Gregory, Craig Ellis, and John Duncan, jointly and severally, in an undetermined amount believed to be in excess of $10,000,000, plus interest, which sum is to be trebled under 18 U.S.C. § 1964(c), plus attorney's fees,

b)    On Counts 2-7 against the defendants, in an undetermined amount believed to be in excess of $10,000,000, plus interest and attorney's fees as allowed by law,

c)    Costs of this action, and

d)    All other proper relief.

Respectfully submitted,

FOULSTON SIEFKIN LLP

James P. Rankin (#09186)
Jay F. Fowler (#10727)
Jeremy L. Graber (#24064)
FOULSTON SIEFKIN LLP
534 S. Kansas Avenue, Suite 1400
Topeka, Kansas 66603
(785) 233 3600
jrankin@foulston.com
jfowler@foulston.com
jgraber@foulston.com

Ronald P. Pope (#11913)
RALSTON POPE & DIEHL LLC
2913 SW Maupin Lane
Topeka, Kansas  66614
(785) 273-8002
ron@ralstonpope.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims triable by jury.

James P. Rankin (#09186)

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Topeka, Kansas as the place of trial.

James P. Rankin (#09186)

56

## Verification

State of Kansas     )
                     )    *SS.*
Shawnee County   )

I, Joseph Enneking, of lawful age and being first duly sworn, state under oath that I am the plaintiff and act as Trustee of the Schmidt Builders Supply, Inc. Employee Stock Ownership Trust; that on behalf of the Trust I am authorized to make this verification; that I have read the foregoing Complaint and know the contents thereof; and that all of the allegations in the Complaint are true to the best of my knowledge.



Joseph Enneking

Subscribed and Sworn to before me, a Notary Public within and for the County and State aforesaid, on this 1st day of July, 2013.

Notary Public

My Appointment Expires:

CINDY SCHROEDER
NOTARY PUBLIC
STATE OF KANSAS
APPT. EXPIRES 2-19-2015

57