IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JOSEPH ENNEKING,

      Plaintiff,

      vs.                        Case No. 13-4070-JTM

UNIVERSITY NATIONAL BANK, *et al.*,

      Defendants.


MEMORANDUM AND ORDER


Following the collapse of the housing market in Junction City Kansas, the owner of an interest in a failed building supply company has brought a variety of claims against numerous defendants, including claims under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962. The plaintiff alleges that Schmidt Builders Supply (SBS) was injured as the result of a scheme in which the defendants, including University National Bank (UNB), Bankers' Bank of Kansas (BBOK), and Walter Craig Ellis (an officer of BBOK), sought to make and conceal bad loans involving John Duncan, SBS's chief executive officer, chief financial officer, and director. UNB, BBOK and Ellis have moved to dismiss under Fed.R.Civ.Pr. 12(b)(6). The court finds that plaintiff's RICO claim is untenable, and the pendent state law claims should be dismissed without prejudice.

In resolving the Motions to Dismiss, the court accepts as true all factual claims in the Complaint. The plaintiff must present sufficient facts to state a cause of action that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, the plaintiff must "nudge [his] claims across the line from conceivable to plausible." *Id*. In this context, a claim is facially plausible if the facts presented in the Complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In resolving a Motion to Dismiss, the court can draw on both its judicial experience and common sense. *Id.*, at 679. While the court accepts as true the factual allegations in the Complaint, it need not accept legal conclusions, expressed either as "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement." *Id.* at 678.

The plaintiff Joseph Enneking is a trustee of the SBS Employee Stock Ownership Trust, which held a 40% interest in SBS. Enneking brings the present action as a derivative claim against the defendants for the harm they allegedly caused SBS. In addition to the defendants who have filed motions to dismiss, the Complaint names two additional defendants: Duncan (the former head of SBS), and Troy Gregory, senior lending officer and Senior Vice-President at UNB from 2005 to 2009. Gregory is no longer employed by UNB. At the time of the Complaint, Duncan had been indicted on charges of bank fraud and money laundering. (¶ 12).[1] Duncan has subsequently pled guilty, and awaits sentencing. Case No. 13-40013-01-JAR.

---

[1] Unless otherwise indicated, all citations by paragraph are to Enneking's Complaint (Dkt. 1).

The Complaint centers on two building developments in Junction City, Kansas, both of which anticipated substantial profits due to the anticipated relocation of the First Infantry Division, the "Big Red One," to nearby Fort Riley. In 2006, Duncan joined three other individuals (Dave Freeman, Bill Skepnik, and Brennan Fagan) in creating Big D Development, LLC.

In 2006, Big D began to develop vacant lots in the Sutter Woods and Sutter Highlands developments, and obtained a $5 million loan from UNB (in which BBOK later participated) to fund its operations. In addition, Big D obtained a $12 million loan from the City of Junction City. According to the Complaint, this assistance was obtained in part because Freeman bribed a Junction City official.

However, Big D began to experience difficulties in 2007 when the anticipated housing boom failed. The Complaint asserts that, in order to conceal their exposure on the Big D loan (which at the time amounted to some $1.88 million in outstanding debt), the Banks decided to make a much larger, $15.2 million loan to the Big D principals for the construction of an apartment complex in Junction City. (¶ 17(e), (g)). The new loan was known as the Bluejay loan, named for Bluejay Properties, LLC, the entity created by Freeman, Fagan, Skepnik, and John Larkin, to undertake the construction.

According to the plaintiff, in order to raise this capital, BBOK and UNB had to fool other banks into participating by supplying false and misleading information. (¶ 17(I)). This false information include false documentation which was supplied by John Duncan. First, on April 16, 2008, Duncan presented a letter to UNB stating falsely that SBS had

3

inventory on hand to use on the project. Second, on April 24, 2008, Duncan created a false, "Photo-shopped" invoice indicating that SBS had much more inventory than it actually had. (¶¶ 101, 110). BBOK and UNB encouraged the participation of the other banks in the Bluejay loan, although they were aware that it was insufficiently collateralized.

The Complaint alleges that funds issued by the Banks to SBS as a part of the Bluejay development was instead diverted away by Duncan for other uses, including deposit into his personal account. (¶¶ 114, 115).

SBS collapsed on July 19, 2011, according to the Complaint, due to "the weight of bank debt [to its own lender, Kaw Valley Bank] and John Duncan's stealing and deception."

Count 1 of the Complaint alleges the defendants violated RICO, 18 U.S.C. § 1962(a)(b) and (c), and also that they conspired to do so, in violation of § 1962(d). through various acts (¶¶ 189-90). Specifically, the Complaint alleges that Duncan committed various acts of mail fraud and bank fraud in connection with obtaining the Bluejay loan. (¶181). They also contend that Ferguson (who is not named as a defendant) committed bank fraud when he bribed the Junction City official in 2006 to obtain initial funding for the Big D project. With respect to the defendant Banks and their agents Ellis and Gregory, the Complaint alleges that they committed bank fraud by engaging in a series of misrepresentations as to the participating banks, to prevent them from knowing of the true economic situation. (¶ 182). The Complaint also presents various state tort claims against the defendants.

In their motion, BBOK and Ellis present four reasons why Enneking's RICO claim

is fatally flawed: (a) the plaintiff has failed to present any plausible "enterprise" involved in the underlying activity, (b) SBS suffered no direct injury from the predicate acts of the supposed racketeering, (c) the defendants did not conduct the supposed enterprise, and (d) the plaintiff has failed to show that the enterprise operated with the requisite continuity. UNB joins two of these substantive arguments (lack of direct injury and lack of continuity) with two procedural arguments. UNB contends that the court should dismiss the action under Fed.R.Civ.Pr. 19(a)(1,) because Enneking has failed to join necessary parties, in particular SBS's lender, KVB. In addition, it argues, the court should dismiss the action under the first-to-file rule, given the previously filed adversarial bankruptcy proceeding, *The University National Bank v. Bluejay Properties, LLC*, Adversary Proceeding No. 12-06130.

Although the Complaint refers to 18 U.S.C. § 1962(a) and (b) (which involve the illegal investment of racketeering income or the use of racketeering acts to acquire control over an enterprise), the essence of the plaintiff's claim is that defendants violated § 1962(c), which prohibits anyone from conducting the affairs of an enterprise through a pattern of racketeering. *See Tal v. Hogan*, 453 F.3d 1244, 1262 (10th Cir. 2006). Count 1 makes no attempt to show that the defendant Banks or Ferguson invested racketeering income in an enterprise, or that they employed a pattern of racketeering activity in order to acquire or maintain control over an enterprise.

In addition to the underlying elements of a claim under § 1962(c), the plaintiff must establish that he was a "person injured in his business or property by reason of a violation

5

of section 1962 of this chapter." 18 U.S.C. § 1964(c). This provision means that the plaintiff's damages must "flow from the commission of the predicate acts." *Sedima, S.P.RL. v. Imrex Co.*, 473 U.S. 479, 497 (1985). "Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 13 (2010). *See also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2005) (in determining proximate causation under RICO, "the central question … is whether the alleged violation led directly to the plaintiff's injuries").

The court finds, first, that the plaintiff's RICO claim is flawed because the Complaint fails to plausibly allege that SBS's damages were proximately caused by the defendant's actions. Civil liability under § 1962 depends upon a direct relationship between the illegal conduct and the plaintiff's injuries. *See Hemi Group*, 559 U.S. at 12 (for RICO analysis, "the focus is on the directness of the relationship between the conduct and the harm"); *Anza*, 547 U.S. at 461.

> The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Bridge*, 553 U.S. at 654 (internal quotations omitted).

As indicated earlier, the plaintiff's Complaint contends that the Bank's agents

6

committed fraud in six specific respects:

   a. Participation Offering sent to participant banks on March 21, 2008 as described in paragraph 96. The falsities contained in the statements were made to deceive Participant banks to lend money for the Bluejay Loan, which constitutes bank fraud.

   b. Addendum to Participation Agreement and Certificate transmitted to participant banks on 4/17/08, which states a $205,000 CD (#4751) secured the collateral, which Troy Gregory and Craig Ellis knew to be false as the CD would be funded with the first loan draw, as described in paragraphs 127-134.

   c. Approving and using backdated CDs (April 11, 2008) to give the appearance of collateral when Troy Gregory and Craig Ellis knew the CDs were not funded until the first draw on April 28, 2008.

   d. Approving the first construction loan draw, funded in part by Participant banks. Troy Gregory and Craig Ellis knew the proceeds were not [to] be used to build the Bluejay apartments but to generate collateral to secure the loan from which it was derived, pay off Big D and other debt unrelated to the Bluejay construction, and clear title to the underlying real property, which had previously been represented to be clear.

   e. Every construction draw requesting management fees for David Freeman was false as described in paragraph 157. Troy Gregory and Craig Ellis knew the fee was to repay Big D and other debt owed to UNB and not for constructing the Bluejay apartments. Craig Linn was the construction manager.

   f. The June 30, 2009 Big D loan Secured by the Bluejay Second, Amended Participation Agreement, and related documents state they are secured by a mortgage dated June 30, 2009. This was false as the mortgage did not become effective until July 7, 2009, the date the Larkins signed.

(¶ 182). All of these acts of alleged illegal conduct were directed at the participating banks; none involved SBS. Thus, all of the cited conduct of Ellis and Gregory was for the purpose of "creating and transmitting the misleading information *to the participant banks* in order to

7

fund the scheme." (¶ 186). The purpose of the supposed scheme was to cover up the insolvency of the earlier, Big D loan." Instead of simply cutting its losses, Craig Ellis and BBOK continued to work with Troy Gregory and UNB in order to keep all the loans current" (¶ 185). SBS may have suffered indirectly as the result of the alleged scheme, but it was not directly injured as the result actions of UNB and BBOK.

Enneking argues that proximate cause is established here by relying on the Supreme Court's decision in *Bridge*, 553 U.S. 639 (2008). The court finds that *Bridge* must be distinguished in light of its unique facts. In that case, the Cook County Treasurer's Office auctioned off various tax liens, and the plaintiffs alleged that the defendants were able to circumvent the rules and obtain more than their proper share of the awards by submitting false, "shadow bids," which had the effect of decreasing the bids awarded to the plaintiffs. The Court simply held that the plaintiffs were not required to show that they relied on the false attestations made by the shadow bidders; it did not hold that proximate causation and direct injury were not required. The Court reached this result given the unique facts of the case, since "there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels from the violation, and no more immediate victim is better situated to sue." 553 U.S. at 658. As the Court stressed, under the unique facts of the case, the "losing bidders were the *only* parties injured by petitioners' misrepresentations." *Id.* (emphasis in *Bridge*).

The Supreme Court later discussed *Bridge* in *Hemi Group*, and again noted that in *Bridge,* "[b]ecause of the zero-sum nature of the auction, and because the county awarded

8

bids on a rotational basis, each time a fraud-induced bid was awarded, a particular [legitimate] bidder was necessarily passed over." *Hemi Group*, 559 U.S. at 14. Thus, the losing bidders were the only parties injured by the "perverse incentive" inherent in the shadow bidding scheme. *Id*. at 14-15.

These unique facts in *Bridge* are not present here. SBS was not a direct party to the Big D or Bluejay loans. It was injured as an indirect result of those loans, as well as by the looting activities of Duncan, its Chief Executive Officer. In *Bridge*, the concerns for duplicative recoveries and multiple causal factors were simply not present, given the zero-sum nature of the auction. The present case is factually much closer to *Hemi Group*, *Holmes*, and *Anza*. Here, there are additional factors that may account for plaintiff's injuries, and (in the participating banks) more immediate victims better situated to sue. *See Hemi Group*, 559 U.S. at 15 (finding a lack of proximate cause where plaintiff's theory was "anything but straightforward," in which "[m]ultiple steps ... separate the alleged fraud from the asserted injury," and further "rests on the independent actions of third and even fourth parties").

A RICO plaintiff must show a direct relationship between the predicate acts and his injuries. The Supreme Court requires direct causation in part because of the difficulty in apportioning responsibility when a plaintiff's injuries are a combination of factors. 503 U.S. at 269. Such concerns are particularly appropriate in the present case. Here, the court would have to apportion responsibility not only to the actions of the defendant Banks in funding the Bluejay loan in 2008, but also among the independent — and now openly confessed — criminal actions of Duncan in looting SBS, the actions other non-defendant

principals such Freeman, Skepnik, and Fagan, SBS's own business practices, the actions of SBS's lender Kaw Valley Bank, actions of City officers in initially funding the original Big D loan (but later refusing to support it), and (last but not least), the fluctutating nature of the local housing market. As the Complaint itself acknowledges, the building in Junction City was the result of "[s]peculative fever" involving troop deployments, a fever later broken by "the bad news about the Big Red One," under which "the housing bubble burst." (¶ 17(a), (e), (l)).

Courts enforce the requirement of direct causation in light of the powerful nature of the RICO remedy, and concern that those remedies may be leveled at "respected and legitimate 'enterprises." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985).

> Civil RICO is an unusually potent weapon — the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly; a prevailing plaintiff, for example, stands to receive treble damages and attorneys' fees. See 18 U.S.C. § 1964(c). For these reasons, it would be unjust if a RICO plaintiff could defeat a motion to dismiss simply by asserting an inequity attributable to a defendant's conduct and tacking on the self-serving conclusion that the conduct amounted to racketeering.

*Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991). Here, because the injury suffered by SBS was a secondary and indirect effect of the supposed actions of the defendants, dismissal of the RICO claim is appropriate.

Second, the court finds that the alleged enterprise lacks the degree of continuity required for RICO violations. RICO requires that the plaintiff establish a pattern of racketeering which is larger that a single scheme or goal. *Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479, 496 n. 14 (1985). See 18 U.S.C. § 1961(5). The requirement of continuity is an essential element of RICO liability. *See Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989) (element of continuity is "more than incidental to the operation of the RICO statute"). As the Eighth Circuit stressed in *Menasco*, the requirement is important, given the powerful remedies available.

> Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences. The pattern requirement in § 1961(5) thus acts to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions such as this one are not eclipsed or preempted.

*Id.* (citation omitted).

"To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc. v. Northwestern-Bell Tel. Co.*, 492 US. 229, 240 (1989). This continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

Here, the Complaint confesses that the various participants in the alleged enterprise "had different motives." This would seem to be something of an understatement, since Duncan's deceptive activities appear to have been directed against his fellow defendants as well as against other parties. And it is hard to see how UNB or BBOK could have been confident of the soundness of the original Big D project, if they had known Freeman began

11

the project by bribing a city official.

Nevertheless, the Complaint contends more broadly that all of the defendants had an overall "essential purpose [which] was to bet on the chance of a big win in Junction City real estate." (¶ 3). The Complaint has to make this broad allegation, in order to aggregate a wide variety of actions so as to maximize the duration of the alleged conspiracy – from Freeman's alleged bribery in 2006 and 2007 to help obtain the Big D city loan, through the ultimate collapse of SBS in 2011.

But this attempt to maximize the duration of the enterprise fails. First, every ongoing business enterprise attempts to maximize profits – to "win big." More importantly, this supposed broader enterprise is incongruent with the more specific rationale the Complaint ascribes to the moving defendants, which is that Ellis, BBOK, and UNB engineered the $15 million Bluejay loan in order to divert attention from the insolvency of the $1.88 million Big D loan. More specifically, once the Big D loan was doubtful, "[i]nstead of simply cutting its losses, Craig Ellis and BBOK continued to work with Troy Gregory and UNB in order to keep all the loans current." (¶ 185).

Thus, rather than a four-year enterprise which sought to profit from the local real estate market, the Complaint essentially alleges a brief period of months in which the moving defendants colluded to conceal the losses on a specific business opportunity. Further, despite the Complaint's conclusory assertion that the defendants' actions "may easily be repeated in the future" (¶ 185), there are no facts pled which would plausibly support this claim. The whole point of the supposed conspiracy was to protect the Big D

loan by issuing the Bluejay loan, and everything regarding those transactions has been publicly exposed. SBS has gone out of business, Gregory is no longer employed by UNB, and the Complaint alleges no facts to support the pure speculation of future harm.

The plaintiff has thus failed to show any plausible danger of repetition of the fraudulent acts by the defendants in the future. Additionally, because the actions of the moving defendants all relate to a closed set of activities in close temporal proximity, all related to the issuance and funding of a single commercial transaction, the plaintiff has failed to plausibly allege the existence of continuity in a closed-end sense. *See RTC v. Stone*, 9989 F.2d 1534, 1545 (10th Cir. 1993) (continuity does not exist "[w]here the scheme has a limited purpose"); *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990) (same, where the scheme had "one discrete goal"); *Torwest DBC, Inc.*, 810 F.2d 925, 928-29 (1987) (pursuit of single objective does not create continuity, "even then that goal is pursued by multiple illegal acts, because the scheme ends when the purpose was accomplished"). Here, the moving defendants allegedly engaged in a scheme to fund the Bluejay loan, which involved a finite commercial development, and thus was a single discrete goal, even if it involved a series of connected predicate acts in the Spring of 2008 to accomplish that goal.

Third, the court agrees that Enneking's action here on behalf of SBS is procedurally defective, given the absence of required parties, particularly Kaw Valley Bank (KVB), SBS's immediate lender. As noted earlier, KVB is actively involved in a separate adversarial action, and that litigation includes state law claims similar to those presented here.

13

The present Complaint specifically alleges that KVB's actions and its loans to SBS also played a role in the insolvency of the company. (¶¶ 164-67). Once SBS failed, KVB acquired SBS's receivables and other assets. *Enneking v. Schimdt Builders Supply*, 917 F.Supp.2d 1200, 1212 (2013) (noting in plaintiff's breach of duty action against SBS, KVB as SBS's "creditor ... took control of the company's assets" following a settlement agreement). Both the adversary action and the present claim involve competing claims involving the downfall of SBS, its damages and its assets. In the adversarial action, KVB attempts to recover the same payments which Enneking seeks to recover here. The failure to include KVB in the present action forces the defendants to face the "substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed.R.Civ.Pr. 19(a)(1)(B)(ii).

Further, the plaintiff has not demonstrated why the present action should proceed in the absence of KVB. Rule 19(c)(2). Enneking suggests that the fault of other tortfeasors need not be joined in order to compare fault under Kansas law, but all the authority cited involves actions seeking recovery for negligence, not the sort of intentional racketeering activity asserted in the present Complaint.

Moreover, the plaintiff has failed to demonstrate why the court should allow the present action to proceed in light of the on-going, and earlier filed, adversarial action. That action includes SBS as a party, and involves similar allegations of misconduct by the defendants. Although the parties in that action have not attempted to apply a thin RICO veneer to those claims, the claims remain substantially similar, and the first-to-file preference accordingly applies. *See Wallace B. Roderick Revocable Living Trust v. XTO Energy*,

*Inc.*, 679 F.Supp.2d 1287, 1296 (D.Kan.2010) (citing Tenth Circuit decisions).

The first-to-file policy defers secondary litigation based on substantially identical causes of action, and thus "avoids the waste of duplication, rulings which may intrude on the authority of sister courts and piecemeal resolution of issues that call for a uniform result." *It's Greek to Me, Inc., v. Varsity Brand*, 2011 WL 6091752, *2 (D. Kan. Dec. 7, 2011).

In summary, the court finds that plaintiff's substantive RICO claim should be dismissed because the Complaint fails to plausibly allege proximate causation or a continuous racketeering enterprise. Given the lack of a valid substantive claim, plaintiff's RICO conspiracy claim is also dismissed. *See Tal v. Hogan*, 453 F.3d 1244, 1270 (10th Cir. 2006). This leaves only pendent state law claims, which are dismissed without prejudice. "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir.1997), *cert. denied*, 524 U.S. 953 (1998) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Independently, the court finds that plaintiff's claims are subject to dismissal under both Rule 19 and under the first-to-file rule. In light of these conclusions, the court need not address the additional rationales for dismissal advanced by defendants Ellis and BBOK.

IT IS ACCORDINGLY ORDERED this 23rd day of December, 2013, that the defendants' Motions to Dismiss (Dkt. 27, 29) are hereby granted.

    s/ J. Thomas Marten

    J. THOMAS MARTEN, JUDGE